Connie SHINHOLSTER, Plaintiff,

v.

AKRON AUTOMOBILE ASSOCIATION, INC., et al., Defendants.

No. C88–884–A.

United States District Court, N.D. Ohio, E.D.

April 11, 1989.

Edward L. Gilbert Co., LPA, Akron, Ohio, for plaintiff.

Edward Kemp, Roetzel & Andress, Akron, Ohio, for defendants.

## ORDER

SAM H. BELL, District Judge.

Plaintiff Connie Shinholster filed this action against her former employer, defendant Akron Automobile Association, Inc. (AAA), also referred to as Akron Automobile Club, and Richard Duffy, the executive director of AAA, in his individual and official capacity. Her employment was terminated on April 10, 1987, by Richard Duffy for issuing a driver's license over the counter without the benefit of certain identification and authorization.

Plaintiff, a black female, asserts two federal civil rights claims in her complaint. First, she claims that the defendants violated 42 U.S.C. § 1981 by applying rules and regulations in a discriminatory manner and by treating her less favorably than white employees. She also claims that defendants violated 42 U.S.C. § 1983 by infringing her fourteenth amendment rights to due process and equal protection. Specifically, she claims that she was treated less favorably by the defendants because of her race and that they maintained different standards based on race. Furthermore, she claims that she was not provided an adequate due process hearing prior to her termination.

Plaintiff also asserts two state law claims. She contends that defendants breached their contract with her based on their Personnel Procedure Manual which contract they are equitably estopped from denying. Second, plaintiff contends that defendants intentionally inflicted emotional distress upon her by providing false, misleading and detrimental references to her perspective employers.

Plaintiff seeks relief in the form of an injunction as to further discriminatory conduct, compensatory damages in the amount of $1,500,000.00 and punitive damages in the amount of $500,000.00.

The defendants have moved for summary judgment as to all of plaintiff's claims and have submitted several affidavits and plaintiff's deposition in support. Plaintiff opposes the motion contending that material issues of fact remain as to all issues.

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the party moving for summary judgment has the burden of showing that no genuine issue of material fact exists and that as a matter of law, it is entitled to summary judgment. In reviewing a motion for summary judgment, a court must consider the pleadings, related documents and evidence and all reasonable inferences in a manner most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Smith v. Hudson*, 600 F.2d 60 (6th Cir.1979); *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979); *Board of Ed. Cincinnati v. Department of H.E.W.*, 532 F.2d 1070 (6th Cir.1976). The inquiry performed at this stage is whether a trial is required to resolve genuine factual issues. "[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citations omitted). *See, also, Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The facts which follow are drawn from the evidence before the court.

Plaintiff was employed as a clerk/typist in the License Department of AAA from October, 1979 until April 10, 1987. AAA has maintained a License Department at its Akron office for at least eighty years as a service to its members. AAA provides all personnel, office space, equipment, utilities and other expenses necessary to properly discharge licensing functions.

Defendant Richard Duffy became a Deputy Registrar of the State of Ohio Bureau of Motor Vehicles (BMV) on July 1, 1986, and continued in that capacity at all times

pertinent to this lawsuit. He has been employed by AAA for eighteen years and is now Vice President, General Manager and Chief Executive Officer of AAA. He is the most senior employee in the Akron office. His duties as Deputy Registrar are defined in the Deputy Registrar Agreement with the Bureau of Motor Vehicles— State of Ohio (the Agreement).

The income generated by the License Department accounts for 5% of AAA's total income. It does cover 90% of the cost of operating the license department, however. Deposition of Richard J. Duffy at 100. Operation of the License Department is viewed by AAA as an essential service it provides to its members and the general public.

Pursuant to the Agreement, Mr. Duffy, as Deputy Registrar, must adhere to all regulations set out in the Ohio Revised Code and Ohio Administrative Code. His appointment may be revoked and his appointment terminated by the Registrar of BMV in the event of a breach of any of the terms of the Agreement.

The issuance of a duplicate driver's license is governed by terms outlined by the BMV. Initially, certain identification must be shown from a range of acceptable forms. The clerk/typist then types certain data into the computer which brings up all of the information which will appear on the duplicate. The information is thereafter transferred onto an Application for Driver's License which the applicant signs. After paying the fee and being photographed, the applicant is given one copy of the Application for Driver's License as a temporary driver's license. The paperwork is then sent to the Columbus office of BMV which issues the duplicate license through the mail. Only in extraordinary cases will a duplicate license be issued over the counter and before that is permitted, authorization must be received over the telephone from the Columbus office of BMV. A notation should be made in that case on the duplicate that it was issued over the counter per authorization from the person contacted in Columbus.

Every transaction for a duplicate driver's license which is typed into the computer is recorded on its hard disk memory. Each evening the computer maintained by the Columbus office of BMV places a telephone call to the computer at AAA and receives all of the information that was stored on its hard disk memory that day. Once the information regarding an application for a duplicate license is recorded in the Columbus computer, the applicant's previous driver's license will be voided. If an application for a duplicate is voided the same day it is issued, it is deleted from the hard disk memory. The transaction cannot be voided once it is transferred to the computer in Columbus at the end of a given business day.

Mr. Duffy was contacted by Special Agent Frederick F. Lawman in the Spring of 1987 in relation to an investigation he was conducting into the theft and forgery of a United States Treasury check payable to Clifford R. Cooper. A driver's license number was noted on the face of the check which was found to be a duplicate issued from the Akron AAA office.

On April 8, 1987, Mr. Duffy gave Special Agent Lawman permission to interview plaintiff. Plaintiff admitted in that interview that on or about March 27, 1986 she had issued the duplicate over the counter without requiring any identification and without seeking authorization from the Columbus office of BMV. She said that her husband had asked her to issue the license to his friend, and she did so as a favor to her husband. The individual claimed to need the license immediately as a means of identification for an employment application. She denied any knowledge of the Cooper check or any involvement with it by her husband.

Later the same day the duplicate was issued, the man claiming to be Cooper returned to AAA and said he had found his original license. He relinquished the duplicate and received a refund of the license fee. The application for duplicate was then marked VT for "void tonight" and was thereby deleted from the computer's hard disk memory for transfer to Columbus.

Mr. Duffy interviewed plaintiff after her discussion with Special Agent Lawman and asked her about the incident. She made the same admissions to him but stated that she had no idea the duplicate would be used for identification in cashing a stolen check. She never again saw the man who applied for the duplicate and neither she nor her husband have been interviewed by any government agent in relation to their participation in or charged with any crime.

On April 10, 1987, Mr. Duffy terminated plaintiff's employment with AAA after obtaining the advice of counsel and advice and concurrence of the President of AAA. Deposition of Richard J. Duffy at 80. He explained that he was taking this action because plaintiff violated BMV policy by issuing a duplicate driver's license over the counter without proper identification and authorization, that the duplicate issued was used in cashing a forged United States Treasury check, and that the return of the duplicate the same day implicated her, at least unwittingly, in the scheme to cash the check, if such criminal act did in fact occur. Mr. Duffy considered this a very serious offense and, to his knowledge, an offense not previously committed by any employee in the License Department. Any employee committing this offense would be subject to immediate termination in his view pursuant to AAA's policy on termination. This policy provides for a warning after a first offense, two weeks suspension after a second offense and discharge after a third offense. However, according to the policy an employee can be immediately terminated for a serious offense without following all of the steps. All AAA employees are hired for indefinite periods of time and are subject to AAA's policy on discipline.

Mr. Duffy recalls only one incident when he directed an employee to accept an application for duplicate driver's license without proper identification. That incident involved an acquaintance of his whom he had known for twenty-five years and who had a bank statement, an acceptable form of identification, but which contained a transposition of two numbers in her social security number. A duplicate license was not issued over the counter, however.

Plaintiff's work history contained no other incidents of this nature. Mr. Duffy noted only some problems with attendance and tardiness which plaintiff disputes.

In the eighteen years Mr. Duffy has been with AAA, one person was suspended for attendance problems, Kathy Decker, a white female. Her suspension occurred only after she was placed on probation. This individual resigned her position at AAA. In his eighteen years, there have only been two employees who have been placed on probation, one white female and one black female.

Plaintiff states that all of the clerk/typists in the License Department have issued duplicate licenses without proper identification. Deposition of Connie C. Shinholster at 60–63. She admits, however, that, to her knowledge, this practice never came to Mr. Duffy's attention. *Id.* at 60. Ginni Zverloff, another AAA employee, stated in her deposition that she heard that others issued duplicates without proper identification but she never did nor was she ever asked to do so by a supervisor, nor did she ever witness such practice. Deposition of Ginni Zverloff at 8–10. Ms. Zverloff also states that she has never been asked by any applicant to issue a license over the counter and that she frequently calls the Columbus office of BMV for guidance or checks with her supervisor. *Id.* at 13–14. Mr. Duffy only recently became aware that anyone processed applications without proper identification and feels that no other licenses have been issued over the counter without BMV authorization. Deposition of Richard J. Duffy at 39–40, 55, 83.

Plaintiff states in her affidavit that similarly situated white employees followed the same procedures she did but were not disciplined. She states further that all supervisors and clerk/typists in the License Department were informed that the accepted policy was to allow individuals who were in need of immediate identification to receive the license over the counter without proper identification. The written policy of BMV dated October, 1982 attached to her

affidavit, however, *requires* certain forms of identification and states in part:

If the person who signs the application for a driver license ... does not provide identification as required by the rule, the application shall not be accepted.

Persons specifically identified by plaintiff who were treated differently are Kathy Decker, Connie Romine and Lorraine Esler, all white females. Mrs. Decker was disciplined for absenteeism and resigned as previously discussed. Connie Romine was allowed to transfer because of her difficulty in dealing with customers. Lorraine Esler was allowed to resign rather than be fired but plaintiff is not aware of the reason for the discipline. Deposition of Connie C. Shinholster at 49–50. Plaintiff knows of no other employee who has been disciplined for the offense she committed. *Id.* at 49. Mr. Duffy has not disciplined anyone for this offense as no one has committed the same offense. Deposition of Richard J. Duffy at 6.

A replacement for plaintiff was hired by AAA on July 14, 1987. She is a black female. Prior to her hire, plaintiff's duties were not assumed by any specific individual. A second person, who is white, has since been hired.

Plaintiff interviewed for a number of jobs after she was terminated by AAA. Two interviews, with Ohio Edison and Roadway, were very positive, and she felt that she was being favorably considered until contact with her former employer was made. In each instance, she was not offered employment. Mr. Duffy submits, however, that on each occasion that AAA has been contacted by prospective employers, AAA has verified plaintiff's past employment and recommended that she be hired. Affidavit of Richard J. Duffy at ¶ 46.

I.  Plaintiff's Claim Pursuant to 42 U.S.C. § 1981.

■ Section 1981 prohibits racial discrimination in the making and enforcement of private contracts. *See Runyon v. McCrary*, 427 U.S. 160, 168, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976); *Johnson v.*

*Railway Express Agency*, 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975). A claim brought pursuant to section 1981 in an employment setting requires that the plaintiff plead and eventually prove that the defendants treated her differently than their white employees, and that this disparate treatment resulted from intentional or purposeful discrimination by the defendants. *See General Building Contracters Association, Inc. v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982); *Beauford v. Sisters of Mercy–Province of Detroit*, 816 F.2d 1104, 1107 (6th Cir.1987); *Erebia v. Chrysler Plastic Products Corp.*, 772 F.2d 1250, 1257 (6th Cir.1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1197, 89 L.Ed.2d 311 (1986); *Leonard v. City of Frankfort Electric and Water Plant*, 752 F.2d 189, 193 (6th Cir.1985). "This intent requirement may be satisfied by direct allegations and proof of invidious discriminatory animus or circumstantially demonstrated by alleging and proving discriminatory conduct, practices, or the existence of significant racially disproportionate impact." *Id.* at 193. The basic factual issue involved is thus whether the defendants intentionally discriminated against the plaintiff. *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 69 (6th Cir.1985).

The order of proof in a section 1981 case involving allegations of disparate treatment or impact is the same as for a Title VII case. *Cooper v. City of North Olmstead*, 795 F.2d 1265, 1270 n. 3 (6th Cir. 1986); *Long v. Ford Motor Co.*, 496 F.2d 500, 505 n. 11 (6th Cir.1974). When disparate treatment is alleged in either a Title VII or section 1981 setting, a plaintiff must prove "(1) differences in treatment, and (2) a discriminatory motive on the part of her employer." *Underwood v. Jefferson Memorial Hospital*, 639 F.2d 455, 457 (8th Cir.1981), *citing, International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Thus, in the framework of plaintiff's charge that she was

terminated wrongfully, plaintiff carries the burden of establishing a *prima facia* case. In order to do so she must show that she was performing her job at the same proficiency level as her white co-workers, but despite her qualifications, she was discharged while less qualified or equally qualified white employees were treated in a more favorable manner. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817.

Once a plaintiff has establishes a *prima facia* case, an inference, *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089; *Clark v. Huntsville City Bd. of Educ.,* 717 F.2d 525, 529 (11th Cir.1983); *Halsell v. Kimberly–Clark Corp.,* 683 F.2d 285, 289 (8th Cir.1982), or a rebuttable presumption of discrimination is created and the burden of going forward shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employees rejection." *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824; *Tye v. Polaris Joint Voc. Sch. Dist.,* 811 F.2d 315, 317 (6th Cir.1987). A defendant can rebut the inference or presumption of discrimination created by a *prima facie* case by producing some "admissible evidence which would allow the [court] rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 257, 101 S.Ct. at 1096. The defendant does not have the burden of *persuading* the court that it was actually motivated by the proffered non-discriminatory reasons. *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 296, 58 L.Ed.2d 216 (1978). The defendant need only demonstrate that a genuine issue of fact is raised by the evidence as to the reason for the plaintiff's rejection in order to meet its burden of going forward.

If the defendant meets its burden of going forward, then the burden of production, along with the ultimate burden of persuasion, which has never shifted, is upon the plaintiff to demonstrate "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for a discrimination." *McDonnell Douglas Corp. v. Green,* 411 U.S. at 804, 93 S.Ct. at 1825. *See, also, Jackson v. RKO Bottlers of Toledo, Inc.,* 743 F.2d 370 (6th Cir.1984); *Williamson v. Owens–Illinois, Inc.,* 589 F.Supp. 1051 (N.D.Ohio 1984).

Applying these standards to the facts of this case, the court finds no material issue of fact on the central requirement of intentional racial discrimination. Plaintiff was obviously qualified for the position she held for eight years. Her allegation is, in essence, that although she completed the driver's license application process without proper identification contrary to BMV policy, all clerk/typists in the License Department did this and she was the only one disciplined. Further, she claims that she was treated differently because the various steps of AAA's discipline policy were followed for her white co-workers while she was discharged immediately. But there is *no* evidence of racial animus in the effort to support either of these allegations.

Accepting plaintiff's statement that all of the clerk/typists violated BMV policy at times, she admits that Mr. Duffy was not aware of these infractions. This is consistent with his affidavit testimony that he knew of no other employee who committed the same offense as plaintiff and any employee committing the same offense would also be terminated. This is not a case of disparate treatment but merely a case where plaintiff's offense was discovered and discipline administered by Mr. Duffy consistent with his view of the seriousness of that offense. No other employee has been disciplined for this conduct and thus, in a strict sense, there is no similarly situated employee who was or could have been treated differently.

In a general sense, plaintiff claims that white employees were disciplined less harshly regardless of their infractions of the rules. The evidence indicates, however, that the one person suspended by Mr. Duffy over the course of eighteen years was white and of the two persons placed on

probation, one was white and one was black. The white females plaintiff cited as being treated differently were disciplined for absenteeism and difficulty in dealing with customers. A third white female she cited resigned according to plaintiff rather than being fired for an unknown offense. These situations are not indicative of better treatment for white over black employees.

Finally, it is noteworthy that plaintiff was replaced by a black female. This fact negates an inference of racial motive in terminating plaintiff.

In summary then, the court finds that plaintiff has not established a material issue of fact on the issue of whether intentional racial discrimination played any part in the decision to terminate her employment. The undisputed evidence establishes that this action was taken for legitimate business reasons which were not a pretext for discrimination. Accordingly, defendants' motion for summary judgment on this claim must be granted.

## II. Plaintiff's Claim Pursuant to 42 U.S.C. § 1983.

To establish a claim under section 1983, there are two jurisdictional prerequisites. First, plaintiff must have been deprived of rights, privileges or immunities secured by the Constitution and laws of the United States. *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Second, it must be alleged that the defendants were acting under color of law when they committed these constitutional deprivations. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

Plaintiff claims that her fourteenth amendment rights to due process and equal protection were violated by the defendants. Any equal protection claim, however, would have to be resolved in the same manner as her claim of disparate treatment under section 1981. Thus, only her due process claim will be considered. In that

regard she claims that she had a protected property interest in her employment of which she could not be deprived by the state without due process. *Goss v. Lopez,* 419 U.S. 565, 573–74, 95 S.Ct. 729, 735–36, 42 L.Ed.2d 725 (1975). The essential requirements of due process are notice of the charges against her, an explanation of the employer's evidence and an opportunity to present her side of the story. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed. 2d 494 (1985).

█ The first issue to be decided is whether the defendants were acting "under color of state law" when plaintiff's employment was terminated. The "state action" requirement of the fourteenth amendment and the section 1983 requirement of action "under color of state law" are identical. *Rendell–Baker v. Kohn,* 457 U.S. 830, 837, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982); *Lugar v. Edmundson Oil Co.,* 457 U.S. 922, 929, 102 S.Ct. 2744, 2749, 73 L.Ed.2d 482 (1982). Under the analysis of both, it is clear that they protect individuals only from governmental and not private action. *Id.* at 930, 102 S.Ct. at 2750.

The Supreme Court has noted that there are several tests which can be applied in the determination of whether there was state action. *Id.* at 937–39, 102 S.Ct. at 2753–55. A private party may become a state actor if he acts in concert with state officials, *id.* at 932–34, 102 S.Ct. at 2751–52, or if the state has provided significant encouragement for the action or if the private entity has exercised powers that are "traditionally the exclusive prerogative of the State." *Blum v. Yaretsky,* 457 U.S. 991, 1004–05, 102 S.Ct. 2777, 2785–86, 73 L.Ed.2d 534 (1982); *quoting, Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 353, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974).

It is clear that licensing of drivers is traditionally within the exclusive power of the state. It is equally clear that plaintiff's infraction was a violation of BMV rules. However, she was a AAA employee and terminated by AAA not because the state required that action, but because her con-

duct was deemed a serious threat to the terms of the Agreement and AAA's right to continue to offer the licensing service. Deposition of Richard J. Duffy at 23, 76, 83. This was a private decision made according to the business concerns of AAA. The state's recourse for breach of the Agreement was to terminate the relationship with AAA not to terminate AAA employees. *See, id.,* at 21.

This court cannot find the necessary state action under the facts of this case. This is not to say that the action of persons performing state registrar functions can never be considered state action. Certainly, if that function is performed in such a manner as to violate the constitutional rights of a consumer of the service, state action may be found. However, plaintiff's termination was the result of the private action of AAA in managing its own employees and the fact that it was based on a violation of BMV rules does not convert it into public action.

■ There is another aspect of fourteenth amendment analysis that must be addressed in this case; *i.e.,* whether plaintiff's employment was a constitutionally protected property interest. Property interests are not created by the Constitution but stem from an independent source such as state law. *Leis v. Flynt,* 439 U.S. 438, 441, 99 S.Ct. 698, 700, 58 L.Ed.2d 717 (1979); *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Riverview Investments v. Ottawa Community Improvement, Corp.,* 769 F.2d 324, 327 (6th Cir.1985), modified, 774 F.2d 162 (6th Cir. 1985). A person must have more than an abstract need or a unilateral expectation of a property interest for it to receive due process protection. There must be a legitimate claim of entitlement to it. *Board of Regents of State Colleges v. Roth,* 408 U.S. at 577, 92 S.Ct. at 2709.

In this case, plaintiff was employed by a private employer for an indefinite term. She had no claim of entitlement to continued employment from any source. Thus, she did not have a property interest in her employment sufficient to require AAA to afford her a pretermination hearing. There is thus no need to consider whether the hearing she was afforded in this case satisfies the *Loudermill* requirements.

### III. Plaintiff's Breach of Contract Claim

■ Plaintiff claims that defendants breached an employment contract with her by failing to follow the Personnel Procedure Manual and the policy, practice and custom of AAA when she was discharged. Plaintiff agrees that her original employment was originally an at-will employee but that the contract was altered by the disciplinary procedures contained in the Personnel Procedure Manual which was later introduced, which procedures she relied on.

Ohio recognizes that absent a specific term of employment the employment-at-will doctrine allows either party in the relationship to terminate it for any reason not contrary to law. *Phung v. Waste Management, Inc.,* 23 Ohio St.3d 100, 102, 491 N.E.2d 1114 (1986); *Mers v. Dispatch Printing Co.,* 19 Ohio St.3d 100, 103, 483 N.E.2d 150 (1985). However, Ohio courts have also found that under certain facts and circumstances parties can be said to have modified an at-will employment relationship to create an enforceable agreement which protected the employee from termination without just cause. *Mers v. Dispatch Printing Co.,* 19 Ohio St.3d at 101, 483 N.E.2d 150, headnote 2, 103, 105; *Jones v. East Center Community Health, Inc.,* 19 Ohio App.3d 19, 21–24, 482 N.E.2d 969 (Lucas Cty.Ct.App.1984). Provisions in an employment manual have been found to be binding on an employer on a promissory estoppel theory, even in an at-will relationship, if the employer should reasonably expect those provisions to induce action or forebearance by the employee and which does so induce or cause forebearance by the employee. *Jones v. East Center for Community Development Mental Health, Inc.,* 19 Ohio App.3d at 23–24, 482 N.E.2d 969. Under a theory of equitable estoppel, plaintiff must show that: (1) a promise was made by defendant; (2) which the promisor should reasonably expect to induce action or forebearance; (3) and which did induce

such action or forebearance; and (4) enforcement of the promise is the only way to avoid injustice. *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d at 104, 483 N.E.2d 150.

Plaintiff concedes that the policy manual did not serve as the basis for her acceptance of her position as it was promulgated later. *See Cohen & Co. v. Messina*, 24 Ohio App.3d 22, 24–25, 492 N.E.2d 867 (Cuyahoga Cty.Ct.App.1985); *Jones v. East Center for Community Mental Health, Inc.*, 19 Ohio App.3d at 21–22, 482 N.E.2d 969. Furthermore, there is no evidence that terms in the manual were bargained for later so as to constitute a modification of the parties' original relationship. *See Helle v. Landmark, Inc.*, 15 Ohio App.3d 1, 8, 472 N.E.2d 765 (Lucas Cty.Ct.App.1984). In addition, even if it could be considered a binding agreement under equitable considerations, there was no breach. The disciplinary procedure provides for discharge for serious offenses without going through all of the steps. Plaintiff admitted to Mr. Duffy that she issued the license over the counter without proper identification and without authorization. This is contrary to BMV policy and could constitute a breach of Agreement and possible termination of the licensing service at AAA. Mr. Duffy considered this a serious offense which justified immediate termination under the disciplinary procedure outlined in the Personnel Procedure Manual. Plaintiff's admission distinguishes this case from the unpublished Eighth District Court of Appeals opinion in *Grissett v. Cleveland Athletic Club*, No. 53719, 1988 WL 39295, April 28, 1988, upon which she relies. Entry of summary judgment by the trial court was reversed in that case because the plaintiff disputed that he committed the infraction for which he was discharged and was discharged in contravention of the procedure outlined in the defendant's policy manual. There is no such dispute here. Plaintiff admits the conduct for which she was terminated, admits that it was contrary to written policy and the policy manual provides for immediate termination for serious offenses.

Thus, plaintiff's breach of contract claim based on the Personnel Procedure Manual must also fail.

## IV. Plaintiff's Claim for Intentional Infliction of Emotional Distress

Plaintiff claims that she suffered emotional distress intentionally inflicted by the defendants when they terminated her and thereafter through detrimental references to prospective employers. Defendant maintains that the undisputed evidence does not support such a claim under Ohio law.

Clearly plaintiff has not shown the extreme and outrageous conduct required to establish the intentional or reckless infliction of severe emotional distress under Ohio law. *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 6 Ohio St.3d 369, 374–5, 453 N.E.2d 666 (1983); *Jackson v. Wooster Bd. of Ed.*, 29 Ohio App.3d 210, 211, 504 N.E.2d 1144 (Wayne Cty.Ct.App. 1985). The requisite conduct required to establish this tort was explained by the Ohio Supreme Court in *Yeager* and reiterated in *Reamsnyder v. Jaskolski*, 10 Ohio St.3d 150, 153, 462 N.E.2d 392 (1984). Liability can be found only when the conduct complained of goes beyond all bounds of decency so as to be regarded as atrocious in a civilized community. Even if defendants gave plaintiff a reference which included the cause for her termination, this conduct does not approach the requisite degree of outrageousness. Furthermore, an employee naturally suffers some degree of emotional distress upon termination of her at-will employment. This alone has been found by at least one Ohio court not to meet the requirements of an intentional infliction of emotional distress claim. *Foster v. McDevitt*, 31 Ohio App.3d 237, 511 N.E.2d 403 (Montgomery Cty.Ct.App.1986) (syllabus 1). Plaintiff explained in her deposition that she suffered nervousness and sleeplessness after she was terminated and regularly took Valium. Deposition of Connie C. Shinholster at 74, 76. She was not under a physicians care for her symptoms. *Id.* at 74. Under these facts, the requisite seriousness of the emotional distress un-

derlying either the negligent or intentional infliction has not been demonstrated. *Id.* at 374, *citing Paugh v. Hanks,* 6 Ohio St.3d 72, headnote 3a, 451 N.E.2d 759 (1983).. This quantum of injury was defined in *Paugh* as follows:

We view the standard of "serious" emotional distress as being a more reliable safeguard than an "ensuing physical injury" requirement in screening out legitimate claims. By the terms "serious," we of curse go beyond trifling mental disturbance, mere upset or hurt feelings. We believe that serious emotional distress describes emotional injury which is both severe and debilitating. Thus, serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case.

A non-exhaustive litany of some examples of serious emotional distress should include traumatically induced neurosis, psychosis, chronic depression, or phobia.

6 Ohio St.3d at 78, 451 N.E.2d 759 (citation omitted).

Tort law regarding the negligent infliction of emotional distress in Ohio has been expanded in recent years to allow recovery absent physical injury. *See Paugh v. Hanks,* 6 Ohio St.3d at 74–87, 451 N.E.2d 759; *Schultz v. Barberton Glass Company,* 4 Ohio St.3d 131, 132–36, 447 N.E.2d 109 (1983). However, recovery for emotional distress in this context requires the breach of some tort duty from which that injury flowed. *See* Prosser, *Law of Torts* (4th Ed.1971) 237–30, section 54. Plaintiff has stated no tort duty upon which to base defendant's liability. Nor do the facts support any breach of a tort duty.

Thus, defendants are entitled to summary judgment on this claim also.

Accordingly, defendants' motion for summary judgment (Docket NO. 26) is granted and this cause is dismissed in its entirety.

IT IS SO ORDERED.