**Chester G. HAWLEY, Plaintiff,**

**v.**

**DRESSER INDUSTRIES, INC. and George A. Korb, Defendants.**

**No. C–2–85–0332.**

United States District Court, S.D. Ohio, E.D.

May 15, 1990.

Jack R. Alton, Patrick H. Boggs, John C. Wagner, Lane, Alton & Horst, Columbus, Ohio, for plaintiff.

John W. Zeiger, Jones, Day, Reavis & Pogue, Columbus, Ohio, Andrew M. Kramer, Nancy C. Lee, Jones, Day, Reavis & Pogue, Washington, D.C., for defendants.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter comes before the Court to consider the motion of the defendants, Dresser Industries, Inc. ("Dresser") and George A. Korb, for partial summary judgment.

In 1985, the plaintiff, Chester Hawley, filed this employment discrimination action against Dresser, his former employer, and defendant George A. Korb, the Corporate Senior Vice President–Operations of Dresser. In 1981, Dresser demoted the plaintiff, then age 59, from his position as President of Dresser's Construction Equipment Group ("CEG") to Vice President–Planning for CEG. James C. Hilton, then age 39, replaced Hawley in the position of President. Hawley and Dresser agreed that the plaintiff would receive essentially the same salary and benefits following the demotion. In 1983, Dresser eliminated the plaintiff's position and, unlike other individuals in these circumstances, Dresser terminated Hawley instead of transferring him to another position within Dresser.

On May 8, 1984, Hawley's attorney mailed a letter to the Equal Employment Opportunity Commission notifying it of the plaintiff's intention to file suit in federal court in order to assert a discriminatory discharge claim. In addition, the plaintiff filed an official charge form with the

EEOC alleging discriminatory discharge on August 28, 1984. The plaintiff then filed this action on January 18, 1985.

On July 20, 1988, the Court denied a summary judgment motion filed by Dresser on discriminatory discharge claims brought under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634 (1982 & Supp. V 1987). Also, on March 8, 1990, the Court granted in part and denied in part the plaintiff's motion for partial summary judgment concerning certain issues regarding the writings which elaborate the terms and conditions of the plaintiff's employment. Further, on April 19, 1990, the Court denied the plaintiff's Motion for Reconsideration of its March 8 Opinion and Order. In this motion, the defendants seek dismissal of most of Hawley's claims.

In considering the defendants' motion, the Court is mindful that summary judgment is appropriate only in limited circumstances. Rule 56(c) of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The moving party bears the burden of establishing the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The United States Supreme Court has held, however, that the standard of summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). This is true where, for instance, the dispute turns only on a legal question and the moving party must prevail as a matter of law even if the Court were to resolve all factual disputes in favor of the non-moving party. *Miller v. Consolidated Aluminum Corp.*, 729 F.Supp. 1154, 1155 (S.D.Ohio 1990); *see Ross v. Franzen*, 777 F.2d 1216, 1222 (7th Cir. 1985); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2725, at 79 (2d ed. 1983).

A summary judgment motion also requires special treatment of the record. The Court "must view the evidence presented through the prism of the substantive evidentiary burden" and determine "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson*, 477 U.S. at 252, 254, 106 S.Ct. at 2512, 2513; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Nonetheless, in making this determination the Court may not impinge upon the proper function of the jury. Therefore, all of "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. With this standard in mind, the Court will address the defendants' motion for partial summary judgment. The Court will consider each of the defendants' arguments in turn.

## I. TIMELINESS OF ADEA DEMOTION CLAIM

The defendants' first argument is that the plaintiff cannot maintain his ADEA demotion claim because he failed to file EEOC charges on it in a timely fashion. Hawley maintains that Dresser demoted him from his position as President of CEG in July 1981 and replaced him with a younger person. The defendants, however, argue that Hawley failed to file a charge with either the EEOC or the Ohio Civil Rights Commission concerning the demotion.

The defendants then cite section 7(d) of ADEA which provides that no "civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been

filed" with the EEOC. 29 U.S.C. § 626(d) (1982). Moreover, persons asserting discrimination claims must file such a charge "within 300 days after the alleged unlawful practice occurred." *Id.* § 626(d)(2). The defendants contend that since Hawley filed no charges asserting the demotion claim within the 300 day limit, he cannot maintain a civil action on the demotion theory; the Court lacks jurisdiction to adjudicate the claim.

In response, the plaintiff notes that he did in fact file a charge with the EEOC. He remarks that he submitted an official charge form on August 28, 1984. This charge, according to Hawley, makes a specific reference to discriminatory demotion and therefore supports the demotion claim in this civil action. Accordingly, this charge satisfies the statute which requires the plaintiff to file a charge with the EEOC.

The defendants state, however, that the demotion took place in July 1981. Hawley filed his charge form in August 1984, far beyond the 300–day limit. They argue that under ADEA the 300–day limit begins to run when the allegedly unlawful acts occur. Thus, the plaintiff's filing of a charge form was untimely, even if the Court were to construe it to include a claim of discriminatory demotion. The defendants also deny that the August 1984 charge form includes discriminatory demotion.

The plaintiff rebuts by contending that Dresser's actions towards him, including the demotion, were part of a continuing course of conduct which did not end until his termination. Given this continuing course of conduct, the Court should conclude that the time for filing did not begin to run until Dresser notified Hawley of the termination. Furthermore, the filing requirement is subject to waiver, estoppel, and equitable tolling. Where an "employer's own acts or omissions have lulled the plaintiff into foregoing prompt attempts to vindicate his rights," then the Court may consider the filing requirement to be waived or tolled. *Bonham v. Dresser Indus., Inc.,* 569 F.2d 187, 193 (3rd Cir.1977),

*cert. denied,* 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978). Therefore, Hawley states that the time for filing should begin to run on the date of his discharge, not his demotion. Dresser notified Hawley of the discharge in September 1983. Apparently, Hawley believed at the time he drafted his responses, that charges filed in August 1984 would be timely, assuming the limit began to run in September 1983.

The defendants rejoin by noting that the time period begins to run on the date of the demotion, not later when the plaintiff learns of the discrimination. Also, the defendants contend that when an employer demotes and later terminates an employee, the time period for the demotion claim begins to run on the day in which the demotion occurs. Demotion is a completed action and would not be an act of a continuing nature. Finally, the defendants admit that the filing limit may be subject to equitable tolling, waiver, or estoppel. They posit, though, that tolling, waiver, and estoppel are not appropriate in this case. Therefore, Hawley's time for filing began on the date of the demotion and the charge form filed on August 28, 1984 was untimely.

Although the plaintiff stated in his memoranda concerning this motion that "the time limit for filing a claim with the EEOC did not begin to run until September 1983"[1] because of tolling, he has subsequently changed his position. In memoranda regarding a related motion, the plaintiff claims that tolling delayed the beginning of the 300–day limit not just until September 1983, but also until December 1983. Hawley reasons that since the parties were negotiating and that the date and terms of termination were "ambiguous" until December 14, the time limit began to run at the earliest on December 14. On that date, Gene Leeson had informed Hawley that his termination would be effective December 15.

In order to resolve this issue, the Court must turn first to the threshold issue of whether the plaintiff has filed a charge

---

**1.** Plaintiff's [First] Memorandum Contra at 16.

with the EEOC on the issue of discriminatory demotion. In his memoranda on this motion, the plaintiff does not allege that he filed a charge other than the one submitted on August 28, 1984. In the related motion, though, the defendants brought to the Court's attention a letter which Hawley's counsel, Jack R. Alton, wrote to the EEOC on May 8, 1984. Appendix A. This letter may also constitute a "charge" within the meaning of section 7(d) of ADEA, 29 U.S.C. § 626(d) (1982). The Court will consider the possibility that one or both of these documents satisfy the "charge" requirement of section 7(d).

It "is well settled that the filing of a charge with the EEOC is a jurisdictional prerequisite to the filing of a civil action under ADEA." *Vinson v. Ford Motor Co.*, 806 F.2d 686, 688 (6th Cir.1986), *cert. denied*, 482 U.S. 906, 107 S.Ct. 2482, 96 L.Ed.2d 375 (1987). Thus, the Court must ascertain whether the May 8, 1984 letter or the August 28, 1984 charge constitutes a sufficient charge of discriminatory demotion. Unless the letter or the August 28 charge form properly raises the demotion claim, the Court must conclude that it lacks subject matter jurisdiction over the claim.

The May 8 letter, written by Hawley's counsel, notifies the EEOC of an intent to file a lawsuit against Dresser and Korb. Hawley states, as his sole claim in the letter, that Dresser unlawfully discharged him. Counsel then describes the background information regarding the claim. In this discussion, counsel notes that on "July 6, 1981 [Hawley] was advised that he was being replaced as President of that Group but that the corporation wanted him to remain in another capacity." Appendix A (letter to EEOC from Jack R. Alton). This passage is the only mention of the demotion. Alton concludes that "it is Mr. Hawley's claim, and the facts appear convincingly to support such claim, that he was discharged because of age." *Id.*

The August 28 charge contains three paragraphs of background information and another paragraph states the reasons why Hawley believes Dresser discharged him because of his age. One of the background paragraphs mentions the demotion, but does not state that the demotion took place because of age discrimination. The only paragraph mentioning why Dresser discriminated against the plaintiff was the one explaining the discharge claim.

■ In general, the Court must construe EEOC charges liberally when deciding whether they properly raise certain claims of discrimination. Charges "will generally be filed by lay complainants who are unfamiliar with the niceties of pleading and are acting without assistance of counsel." *Tipler v. E.I. du Pont de Nemours & Co.*, 443 F.2d 125, 131 (6th Cir.1971). "As a result, federal courts should not allow procedural technicalities to preclude" discrimination complaints. *Id.* "When this approach is applied to the determination of whether a judicial complaint encompasses the EEOC charge, it is clear that the exact wording of the charge of discrimination need not 'presage with literary exactitude the judicial pleadings which may follow.'" *Id.* (citation omitted). "Rather, the complaint in the judicial proceedings is only limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Id.* (citation omitted).[2]

In *Tipler*, the court concluded that the plaintiff's EEOC charge included a retaliatory discharge claim for purposes of deciding whether the charge supported the allegations in the judicial complaint. The court noted that the plaintiff had mentioned in the charge retaliation and discharge without just cause. Accordingly, the plaintiff could maintain a retaliatory discharge claim under Title VII. Although the judicial complaint was a "more detailed and refined contention" of retaliatory discharge, 443 F.2d at 131, the inartfulness of the EEOC charge did not preclude it from providing a basis for asserting the retaliatory discharge claim in the lawsuit.

---

**2.** The Sixth Circuit endorsed this analysis for determining the permissible scope of ADEA actions following the filing of EEOC charges in

*Cedar v. Premier Industrial Corp.*, 869 F.2d 1489 (6th Cir.1989).

Another enlightening case is *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir.1970), *cited with approval in EEOC v. Bailey Co.*, 563 F.2d 439, 447 (6th Cir.1977), *cert. denied*, 435 U.S. 915, 98 S.Ct. 1468, 55 L.Ed.2d 506 (1978). The court allowed a plaintiff to go forward on charges of discrimination on the basis of national origin under Title VII when the charge had alleged sex discrimination. The EEOC investigation had revealed the true basis of discrimination and the court declined to penalize the lay plaintiff for failing to attach the proper legal conclusion to her claim.

In *EEOC v. McCall Printing Corp.*, 633 F.2d 1232 (6th Cir.1980), black employees filed EEOC charges alleging a refusal of the employer defendant to afford them certain seniority rights because of race discrimination. In reciting the history of the case, the EEOC charges stated that the employer had recently given these same seniority rights to women pursuant to a conciliation agreement.

The court held that the plaintiff's subsequent Title VII suit could raise not only the claim that the employer's refusal to grant seniority was an act of race discrimination, but also the suit could raise the claim that the conciliation agreement itself was an act of race discrimination. *Id.* at 1234–35. The failure of the charges to mention the agreement with female employees as a separate and distinct act of discrimination did not bar the EEOC from asserting such a claim at trial. *Id.* at 1235. The court reasoned that an EEOC investigation of the claims of discrimination involving the conciliation agreement "could reasonably have been expected to grow out of the charges filed." *Id.*

The court applied a similar analysis in *Vinson v. Ford Motor Co.*, 806 F.2d 686 (6th Cir.1986), *cert. denied*, 482 U.S. 906, 107 S.Ct. 2482, 96 L.Ed.2d 375 (1987). The plaintiff filed an ADEA action after having filed charges with the EEOC. In his suit, he alleged discrimination in a failure to promote him and a demotion. The plaintiff had mentioned the demotion to the EEOC in an interview, but the charge filed alleged only the failure to promote. As a result, the court held that it was proper to overturn a jury verdict for the plaintiff on the demotion claim. *Id.* at 687–88.

The *Vinson* court reasoned that the statement about demotion, mentioned to the EEOC in the interview, served only as historical background to the charge of failure to promote. Also, the plaintiff did not introduce evidence regarding the scope of the EEOC investigation. Accordingly, the court could not ascertain whether the EEOC attempted to conciliate the demotion claim. Finally, the court considered an articulation of the demotion claim to be a reasonable requirement of filing suit because such articulation is a necessary condition of the proper functioning of the administrative process. *Id.* at 688.

Finally, in *Cedar v. Premier Industrial Corp.*, 869 F.2d 1489 (6th Cir.1989), the court extended the analysis in *Vinson.* The plaintiff mentioned in his charge certain facts about the employer's behavior to the EEOC only as historical background to a claim of discriminatory demotion. The court held that such facts cannot give rise to a claim of constructive discharge in a judicial action, even if the plaintiff made mention of them in the charge itself, and not just in an EEOC interview. Yet the court alluded to the possibility that if the plaintiff had placed in the charge extensive factual allegations which clearly point to the unnamed legal conclusion that constructive discharge took place, the plaintiff could have raised the claim in his judicial complaint.

■ In this case, the Court interprets the August 28 charge form to state that the plaintiff's main complaint is discriminatory discharge. Similar to *Vinson,* although Hawley mentioned that Dresser demoted him, this statement was only by way of historical background to the main charge of discriminatory discharge. Nevertheless, unlike *Cedar,* the plaintiff unambiguously stated that he was demoted in the charge. This statement suffices as a factual allegation which would have brought the matter to the Commission's attention as part of Dresser's conduct

which would have been the subject of investigation, just as in *McCall.*

Also, similar to *Sanchez*, the Court declines to penalize Hawley for failing to use the magic words "discriminatory demotion" in addition to "discriminatory discharge." Finally, the Court finds an analogy to *Tipler* appropriate. Although the amended judicial complaint was a "more detailed and refined contention" of discriminatory demotion, the inartfulness of the EEOC charge does not preclude it from providing a basis for asserting the demotion claim. *Tipler,* 443 F.2d at 131. Accordingly, the August 28 charge form adequately raises the demotion theory.[3]

 Despite the fact that the August 28 charge supports a demotion claim, the Court holds that the May 8 letter does not.[4] In a fashion similar to *Vinson*, the letter mentions Hawley's removal from the presidency of CEG only as historical background to the claim of discriminatory discharge. Unlike the August 28 charge, though, Hawley did not unambiguously state he was demoted.

The letter does mention that Dresser replaced Hawley as President. And it mentions that Dresser asked Hawley to stay in "another capacity." Replacement and taking on "another capacity," however, do not have the connotations of demotion. A demotion entails involuntary transfer from a superior position to an inferior position. "Another capacity" does not have such implications. It is ambiguous in the sense that it could indicate a move to an inferior position, but it could also mean a move to an equivalent position. It is also logically possible that "another capacity" indicates a promotion, although such an interpretation is clearly unreasonable in this context.

In any case, the ambiguity of "replaced" and "another capacity" drives the Court to

the conclusion that the letter does not clearly point to the unnamed legal conclusion of discriminatory discharge as required by *Cedar* in a case like this. Therefore, *Vinson* is dispositive here. The Court concludes, then, that Hawley did not identify demotion in his letter as part of "the conduct he believes is discriminatory" as the statute requires. *Vinson,* 806 F.2d at 688. The letter is certainly not a "clear and concise statement of the facts" which could include the plaintiff's demotion claim. 29 C.F.R. § 1626.8(a)(3) (1989). Accordingly, the Court holds that the May 8 letter, even if it suffices as a charge of discriminatory discharge, is insufficient to support a discriminatory demotion claim. Nevertheless, the August 28, 1984 charge suffices at this point for the plaintiff to meet the threshold requirement that he show *something* which could constitute a charge of discriminatory demotion.

Having resolved the threshold issue of whether Hawley filed a charge which can provide a proper basis for asserting a discriminatory demotion claim in this lawsuit, the next question is whether the charge was timely. The plaintiff admits that he filed the EEOC charge form more than 300 days after the demotion, but he claims in his memoranda on this motion that the demotion and discharge are part of a continuing violation and, alternatively, that the limit was tolled until the time of Hawley's discharge in September 1983.

Even if the Court accepts the plaintiff's continuing violation and tolling arguments, however, the plaintiff would still have to show that he filed a charge within 300 days of the last and decisive act he alleges, the discharge. Here, Dresser notified Hawley in September 1983 that it planned to terminate him. If, as the plaintiff originally claimed, the time limit began to run in

---

**3.** The Court notes that this is a close question since Hawley's counsel aided him in his EEOC filings. The usual justification for liberal construction, lay filings, is inapplicable in this case. It is generally reasonable for the EEOC to expect proper legal labels in charges when attorneys draft them. No proper label of "discriminatory demotion" appears in the August 28 form. Nevertheless, the mention of demotion in the charge clearly points to discriminatory

demotion. The Court therefore finds that the August 28 form is adequate, even though counsel drafted it.

**4.** The Court assumes for the sake of argument that a letter to the EEOC could suffice as a "charge" for the purposes of 29 U.S.C. § 626(d) (1982).

September 1983, the limit would expire at the latest sometime in July 1984, according to the Court's calculation of the 300–day period. Accordingly, the August 1984 charge form apparently was untimely.

The plaintiff has three potential rebuttals to this argument. First, he could contend that the May 8 letter constitutes a charge of demotion such that even if the limit began to run as early as September 1983, then the filing would be timely. The Court, however, has already held that the May 8 letter is insufficient to constitute a "charge" under 29 U.S.C. § 626(d) (1982). Accordingly, this argument would be unavailing.

■ The plaintiff's second possible response is to say that Dresser's conduct in the Fall of 1983 continued the "continuing violation" which encompassed the demotion and discharge. The Court, however, rejects the plaintiff's original "continuing violation" argument. Simply labelling the demotion and termination parts of a "continuing violation" is not enough to make them such. Although the application of a continuing policy against an employee over time constitutes ongoing conduct, *see Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 614 (10th Cir.1988), the distinct events of demotion and termination do not by themselves indicate a continuing policy.

The Court does not agree with the plaintiff that the demotion was the result of a continuing policy to discriminate against Hawley on the basis of his age. The plaintiffs are impressed that Hawley was far superior in qualifications to his successor, James Hilton. Moreover, Hawley maintains that Dresser did not evaluate Hawley's performance as president of CEG and Korb was not aware of Hawley's success in making the CEG profitable. All of these facts may prove that Dresser demoted Hawley because of his age, but they do not show evidence of an overarching "policy" of age discrimination. *See Janikowski v. Bendix Corp.*, 823 F.2d 945, 948 (6th Cir. 1987). Therefore, no continuing violation extended until December 1983.

Moreover, the plaintiff has not come forth with significant probative evidence of a scheme to "get rid" of all older officers. The plaintiff presented, by way of hearsay, the statement of George Korb that he found it necessary to get rid of all former Jeffrey Galion officers. Also, Hawley stated that he believes that Dresser had a policy of ousting all "oldtimers" at Dresser.

Such statements are not enough to constitute "significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). First, the alleged intention to get rid of all former Jeffrey Galion officers is not expressly premised on a desire to terminate persons because of age. Second, the plaintiff's own conjectures about an overarching scheme of discrimination against "oldtimers" are not enough to avoid summary judgment. Hawley cannot point to statements, documents, facts, or circumstances other than such speculation to bolster his conclusion that Dresser had a general policy to discriminate against older employees. Thus, the Court does not conclude that the demotion was part of a continuing violation which included the termination and events following it. Accordingly, the Court does not hold on the basis of the "continuing violation" argument that the time limit began to run on some date after the demotion, such as December 14, 1983.

The third possible argument against the conclusion that the August 1984 filing was untimely is an extension of the plaintiff's tolling argument. Although the plaintiff earlier stated that the limit was tolled until *September* 1983, he now contends in subsequent memoranda that the limit was tolled until *December* 1983. On December 14, 1983, Gene Leeson wrote a letter to Hawley saying that his termination would be effective as of the next day. Prior to this date, the relationship between the parties was ambiguous and uncertain. The parties negotiated over the benefits Hawley was to receive after termination and over the final date of termination. This "ambiguity" and "uncertainty," Hawley now asserts, entails that the time limit was tolled until the

December 14 letter. August 1984 is within 300 days from December 14. Therefore, the plaintiff believes that the August 1984 filing was timely.

In some cases, the 300–day limit under ADEA is subject to equitable tolling. *Sawchik v. E.I. DuPont Denemours & Co.*, 783 F.2d 635, 638 (6th Cir.1986). In this case, however, even if the Court accepted the plaintiff's original tolling argument that Dresser misconduct tolled the limit until the September 1983 notice of termination, the Court cannot agree with Hawley that tolling could delay the starting date even further until December 1983.

■ The filing period for a discriminatory termination claim begins to run on the date the plaintiff receives notice of termination and not the actual date when his employment terminates. *Janikowski v. Bendix Corp.*, 823 F.2d 945 (6th Cir.1987); *Baer v. R & F Coal Co.*, 782 F.2d 600 (6th Cir.1986) (per curiam). If the time limit on the demotion claim began at termination, it too would begin to run on the date of notice, not the effective date of termination. The plaintiff's argument concerning the ambiguity in his fate before the December 14 letter is the one rejected in *Kessler v. Board of Regents*, 738 F.2d 751 (6th Cir.1984) in an analogous situation. *Kessler* held that employment decisions which are "somewhat ambiguous with respect to ... finality" nevertheless trigger the statute of limitations. *Id.* at 755. In fact, even if the decision were expressly *not* final, the letter confirming the plaintiff's termination would have triggered the statute of limitations. *Id.* at 755–56.

*Janikowski* is similar. In that case, the plaintiff contended that his notification of termination was not final; the company had allegedly left open the possibility of continuing work elsewhere. Despite the alleged lack of finality, the court held that the 300–day limit began to run upon notification of the termination. *Janikowski*, 823 F.2d at 947.

■ The time limit on the demotion claim, then, was not tolled from the September 1983 notification of termination until the December 14 letter. The plaintiff

was on clear notice that Dresser planned to terminate him and therefore he cannot claim that Dresser continued to mislead him to prevent assertion of the demotion claim; Dresser dropped any possible pretense at that time of lulling Hawley by assurances of continued salary and benefits which he could receive if he did not assert a demotion claim. The ambiguity regarding the finality of Dresser's termination decision would not be relevant. *A fortiori*, ambiguity in something other than the termination's finality, where the termination terms and procedures, would not delay the onset of the 300–day limit. Therefore, the plaintiff's final potential argument for the timeliness of the demotion charge is not persuasive.

In conclusion, the Court holds that the August 28 charge form suffices as a "charge" of discriminatory demotion to support a civil action on this theory. Nevertheless, the charge was untimely, because the time limit began to run at the latest in September 1983. Hawley filed the August 1984 form more than 300 days after September 1983. Counsel's May 8 letter cannot serve as a substitute charge, the plaintiff has shown no evidence of a continuing violation, and the time limit was not tolled beyond September 1983. Thus, the plaintiff cannot avoid the conclusion that he filed his demotion charge more than 300 days after the time limit began to run. Accordingly, summary judgment is appropriate for Hawley's ADEA demotion claim.

## II. SCOPE OF SECTION 4101.17

■ The defendants' second argument in favor of partial summary judgment is the contention that Hawley's state law demotion allegation fails to state a claim upon which relief can be granted. The plaintiff is proceeding under a statute that prohibits discrimination against persons between the ages of forty and seventy. Ohio Rev.Code Ann. § 4101.17(A) (Anderson 1980). Section 4101.17(A) proscribes discrimination "in any job opening against any applicant" or discrimination when an employer acts to "discharge without just cause any employ-

ee" who is in the protected class.[5] *Id.*

The defendants claim that the plain language of section 4101.17 prohibits discrimination only in the hiring and termination processes. They conclude, therefore, that the statute does not contemplate liability for demotion decisions.

The plaintiff, by contrast, argues that after Dresser demoted him, he sought and was denied placement in other positions within Dresser prior to his termination. The plaintiff characterizes the defendants' position as one which entails an incorrect assumption that Hawley did not seek reinstatement or promotion to a job equivalent to the one he had as president of CEG. Hawley, then, contends that Dresser's discrimination consisted in part of its refusal to reinstate or promote him after the demotion. This discrimination is cognizable under section 4101.17, the plaintiff asserts.

The defendants respond by noting that even if the plaintiff may maintain a claim against Dresser for failing to promote or reinstate him under the statute, such an action is not the same as a demotion. Failure to promote and demotion are two distinct wrongs. Recovery for demotion does not follow at all from recovery for failure to promote.

The Court agrees with the defendants' position. The Court holds that discriminatory demotion is not actionable under section 4101.17 because its plain language imposes liability only for hiring and termination decisions. Assuming *arguendo* that a failure to promote constitutes discrimination in a job opening against an applicant, the plaintiff would have to assert it as a separate claim. Demotion is an event which is distinct from a failure to promote and it therefore does not fall under the prohibition of section 4101.17. According-

ly, summary judgment is appropriate insofar as Hawley seeks recovery for discriminatory demotion under section 4101.17.

## III. COMPENSATORY AND PUNITIVE DAMAGES UNDER SECTION 4101.17

The third rationale for summary judgment is the defendants' claim that damages pursuant to Hawley's demotion claim are not available under section 4101.17 in the absence of pecuniary harm. Since the Court held that the plaintiff cannot maintain a demotion claim under section 4101.17, the Court need not reach this issue.[6]

## IV. BREACH OF WRITTEN CONTRACT

The defendants' fourth argument for summary judgment is that the defendants did not breach any written contract between Hawley and Dresser. The defendants contend that when Dresser acquired Jeffrey–Galion, it did not agree to assume any employment contracts which it could not terminate on notice of thirty or fewer days. Second, the Letter Agreement dated December 31, 1966 and the Amended Officer Compensation Program dated June 25, 1973 confirmed Hawley's status as an at-will employee. Third, the plaintiff failed to submit any alleged breach of these two documents to arbitration. This failure, Dresser and Korb argue, bars recovery for such a breach in this suit.

The plaintiff counters with the arguments that he made in his motion for partial summary judgment. Hawley contends that an "employment agreement" existed between the parties and four documents define its terms and conditions: (1) the Letter Agreement; (2) the Amended Officer Compensation Program; (3) the Dresser Industrial Relations Manual ("the Manual") dated June 29, 1982 and revised on

---

**5.** In whole, the statute provides:

No employer shall discriminate in any job opening against any applicant or discharge without just cause any employee between the ages of forty and seventy who is physically able to perform the duties and otherwise meets the established requirements of the job and laws pertaining to the relationship between the employer and employee.

*Id.*

**6.** The Court notes in dictum, however, that the defendants are correct. Section 4101.17 does not permit recovery of compensatory and punitive damages in general. The plaintiff may only recover lost wages and benefits. *Hoops v. United Tel. Co.,* 50 Ohio St.3d 97, 101, 553 N.E.2d 252 (1990); *South v. Toledo Edison Co.,* 32 Ohio App.3d 24, 24, 26–27, 513 N.E.2d 800, 801, 803–04 (1986) (paragraph two of the syllabus).

October 1, 1982; and (4) an internal memorandum from Ralph Ytterberg dated October 5, 1982. According to the plaintiff, these four documents establish terms and conditions of employment which preclude Dresser from terminating Hawley without just cause. Hawley contends that his termination was not for just cause and he therefore claims it constitutes a breach of the provisions in these four written documents.

In later memoranda, the defendants argue that Dresser did not breach a written *employment* agreement with Hawley. The defendants contend that the Manual and the Ytterberg memorandum do not govern the terms and conditions of the employment contract between Hawley and Dresser. The defendants posit that the parol evidence rule bars consideration of these two documents. Moreover, they deny that the parties intended the Manual and the Ytterberg memorandum to give rise to contractual obligations. Finally, the defendants contend that even if the Manual and the Ytterberg memorandum were binding, they do not provide that Hawley cannot be terminated without just cause. The relevant allegedly binding provisions isolated by Hawley merely state at most that Dresser would take all possible measures to find a new job for an employee before Dresser would terminate him or her, during a reduction in work force. They do not state that the plaintiff thereby has a blanket protection against termination without just cause in all situations.

■ The Court notes at the outset that the plaintiff apparently asserts that Hawley and Dresser entered an oral employment agreement, not a written one. *See Hawley v. Dresser Indus., Inc.,* 738 F.Supp. 243, 247–248 & nn. 2–3 (S.D.Ohio Mar. 8, 1990). Therefore, the defendants breached no "written employment contract" which established the prima facie employment relationship. Nevertheless, the Letter Agreement and the Amended Officer Compensation Program are together a binding written contract whose provisions may modify or supplement the prima facie employment relationship and give rise

to express and implied contractual duties. Therefore, the plaintiff may still assert that the defendants breached a subsidiary contractual arrangement consisting of a written contract. In a broad sense, then, the plaintiff may continue to claim a breach of written contract in spite of the status of the original employment agreement as an oral contract.

The Court will now consider the defendants' first three arguments that they breached no written contracts: (1) the defendants did not assume any employment contracts which it could not terminate on notice of thirty or fewer days from Jeffrey Galion, (2) the Letter Agreement and the Amended Officer Compensation Program confirmed Hawley's status as an at-will employee, and (3) the plaintiff's action is barred because he failed to submit any alleged breach of the provisions in these two documents to arbitration. The Court will address the first and the third argument at the outset before adjudicating the second argument.

■ The defendants' first argument is that Dresser accepted no employees from Jeffrey Galion which it could not terminate on notice of thirty or fewer days. The Court finds this argument to be unavailing. If the plaintiff is correct in asserting that the Manual and the Ytterberg memorandum give rise to contractual obligations, Dresser's disavowal would have no effect as to promises in these documents issued after the disavowal. Even assuming that Dresser did not agree to take on new employees whom Dresser could not terminate except for just cause, as soon as such employees began to work for Dresser and Dresser began to pay them, a new contractual relationship would arise, one specifically between each employee and Dresser. Such a relationship would be subject to modification by documents such as the Ytterberg memorandum and the Manual.

■ The Court is also unpersuaded by the defendants' third argument, that the Amended Officer Compensation Program required arbitration as Hawley's exclusive remedy for this alleged breach of contract. The Court presumes that Hawley asserts

an oral employment contract supplemented with four documents. The Amended Officer Compensation was but one of those documents. A dispute concerning demotion and termination under "the employment agreement," and in specific the Manual and the Ytterberg memorandum, would not constitute a dispute about the subject matter of the Amended Officer Compensation Program.

The arbitration clause pertains only to disputes relating to the Program. "In the event of any dispute between the Corporation, and any Officer, or between any Officers, *relating to this Program*, such dispute shall be submitted to the then certified public accounting firm representing the Corporation for arbitration." Amended Officer Compensation Program ¶ 78 (emphasis added). The Court interprets this statement to mean that only disputes about the subject of compensation are to be submitted to arbitration.

The word "Program" constrains paragraph 78, limiting its scope to the "Compensation Program" and it therefore encompasses only compensation disputes. The term concerning termination, *id.* ¶ 76, and the employment agreement in general are not part of the "Compensation Program." The defendants themselves distinguish between an "employment contract" which establishes the prima facie employment relationship and an agreement about compensation. *See generally Hawley v. Dresser*, 738 F.Supp. 243, 246 & n. 1 (S.D. Ohio Mar. 8, 1990).

 With regard to the second argument, that the Amended Officer Compensation Program confirms Hawley's at-will

status, the defendants' argument is somewhat more persuasive. In this case, it is undisputed that the Amended Officer Compensation Program, as incorporated in the Letter Agreement, was binding on both parties. Moreover, the Court notes that the Amended Officer Compensation Program contained an express term stating that officers' employment is at-will. "The Board of Directors may change the Organizational Assignment, Grade, Position, or Salary, or terminate the employment of any Officer at any time." Amended Officer Compensation Program ¶ 76.[7] If the Amended Officer Compensation Program and the Letter Agreement were the only documents which modified or added to the terms of Hawley's oral employment agreement, then Hawley could not dispute that Dresser breached no written contract by terminating him.[8]

Nevertheless, the Court is also unpersuaded that no genuine issue remains on Hawley's contract claims in general. The plaintiff presented the Manual and the Ytterberg memorandum as documents which may have constituted an "intended contractual modification." *Bernard v. Rockwell Int'l Corp.*, 869 F.2d 928, 932 (6th Cir. 1989).

In *Bernard*, the court held that a jury could not reasonably conclude that an employee handbook, published several years before the onset of a person's employment, could give rise to an implied contractual duty to refrain from terminating the employee without cause in the face of an express term in the employment contract which stated that employment was at-will. *Id.* at 930, 932. The court concluded that

---

**7.** The defendants also proffer paragraph 65 of the Program as additional evidence of Hawley's at-will status. It provides that participating officers "whose employment is terminated for any reason in any year shall receive" certain compensation. *Id.* ¶ 65(a).

The defendants read this paragraph to mean that Dresser has the right to terminate any officer "for any reason." This does not follow at all. Paragraph 65 provides that all employees who reach the terminated status ("for any reason") are in the category of persons entitled to the listed compensation. This is *not the same* as saying all persons who are employees are

also in the category of those who are terminable "for any reason." Paragraph 65 takes effect only *after* termination. It does not provide grounds for termination *before* the company decides to discharge the officer.

**8.** Hawley argues, however, that the Amended Officer Compensation Program could not justify his discharge because Paragraph 76 authorizes termination only by the Board of Directors. The Court found this argument to be meritless in an earlier Opinion and Order. *Hawley v. Dresser Indus., Inc.*, No. C–2–85–0332 (S.D. Ohio April 18, 1990) (denying motion to reconsider).

Ohio courts would not "imply a contract that would directly conflict with an express contract absent a showing that the parties intended contractual modification." *Id.* at 932.

Given that the Manual and Ytterberg memorandum exist, then, it is possible that they modify the terms and conditions of the original employment agreement as supplemented by the Amended Officer Compensation Program. Therefore, despite the fact that the Amended Officer Compensation Program confirmed Hawley's at-will status, Hawley may not be an at-will employee and Dresser may have breached contractual duties stemming from provisions of the Manual and the Ytterberg memorandum. The crucial inquiry, then, is whether the Manual and Ytterberg memorandum governed the terms and conditions of Hawley's employment. At this juncture, the Court must consider the arguments which the defendants raise to exclude consideration of the Manual and the Ytterberg memorandum.

The defendants raise three arguments why the Manual and Ytterberg memorandum could not have governed the terms and conditions of Hawley's employment: (1) the parol evidence rule bars consideration of these two documents, (2) the parties did not intend the Manual and the Ytterberg memorandum to give rise to contractual obligations, and (3) even if the Manual and the Ytterberg memorandum were binding, they do not provide that Hawley cannot be terminated without just cause. The Court will consider each of these arguments in turn.

In a previous Opinion and Order, the Court addressed the defendants' arguments that the parol evidence rule precludes consideration of the Manual and the Ytterberg memorandum. The Court also addressed the plaintiff's arguments against application of the parol evidence rule. The parties raise the identical arguments here as they did when arguing the merits of the plaintiff's motion for partial summary judgment. The Court held that the parol evidence rule does not bar consideration of the Manual and Ytterberg memorandum, a

holding which is applicable here. *Hawley v. Dresser Indus., Inc.,* 738 F.Supp. 243, 248–249 & nn. 4–5 (S.D Ohio Mar. 8, 1990).

■ The Court also held that a genuine issue of fact remains as to whether the parties intended for the Manual and the Ytterberg memorandum to give rise to binding contractual obligations. *Id.* at 249–250. The Court extends this holding to the instant motion. The Manual and the Ytterberg memorandum are "significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy St. Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987). The Court "cannot conclude that it is undisputable that the parties *did not* intend the Manual to be binding." *Hawley,* at 249. The status of the Ytterberg memorandum is also uncertain. *See id.* at 249–250. Therefore, the defendants' second argument on this issue is unpersuasive.

■ The defendants' final argument, however, is somewhat more persuasive. The Court agrees with the defendants that even if the Manual and the Ytterberg memorandum were binding, they do not contain a generally-applicable provision which precludes Dresser from terminating Hawley without just cause. According to Hawley's characterization of the relevant allegedly binding provisions, the Manual and Ytterberg memorandum provide at most that Dresser would take all possible measures to find a new job for an employee before Dresser would terminate that employee. Moreover, it is clear that such provisions apply only in the context of a reduction in work force. Therefore, the Manual and Ytterberg memorandum do not provide that the plaintiff has protection in all circumstances against termination without just cause.

Although the defendants' argument concerning the provisions of the Manual and the Ytterberg memorandum is persuasive, the argument does not preclude an action asserting a breach of contract in this case. Although these documents do not provide blanket protection against termination

without just cause, they do provide for certain procedures to be followed in case of a reduction in work force and prohibit termination unless certain circumstances prevail during such a reduction and Dresser follows the listed procedures. Such provisions would be applicable, assuming the parties intended to be bound by the Manual and Ytterberg memorandum. In this case, Dresser does maintain that it discharged Hawley because of a reduction in work force.

Hawley could assert, then, that Dresser breached its procedural obligations or duty to refrain from terminating him unless certain circumstances existed. Further, he could maintain that Dresser did not abide by its duties, even if Dresser could have terminated him in every other situation. Absent the proper circumstances and procedural safeguards, therefore, Dresser would have an obligation to refrain from terminating Hawley without just cause. Accordingly, if the trier of fact finds that the Manual and Ytterberg memorandum were binding, Hawley would not be an at-will employee.

▆ The plaintiff elaborates his argument by describing particular breaches of the Manual and Ytterberg memorandum. Specifically, Hawley asserts three breaches of Dresser's duty to do everything possible to keep employees, and in particular those with seniority, within the Dresser organization. He asserts that Dresser did not circulate Hawley's resume to other Divisions, did not prepare a written recommendation, and did not evaluate his work performance. These three facts, which the defendants do not challenge here, could lead a reasonable jury to believe that Dresser did not abide by an obligation to do everything possible to make sure that Hawley would stay within the Dresser organization.

In short, the Court holds that although the defendants did not breach obligations under the Letter Agreement and Amended Officer Compensation Program because they confirm Hawley's at-will status, the Manual and Ytterberg memorandum may govern the terms of Hawley's employment and provide for certain obligations. A gen-

uine issue of fact remains as to whether these two documents are binding. Thus, a genuine issue remains as to whether the documents alter Hawley's at-will status and whether Dresser breached their terms.

Nevertheless, although the Manual and Ytterberg memorandum are written documents, they are not written contracts. The only written contract here consists of the Letter Agreement together with the Amended Officer Compensation Program. The Court holds that the defendants did not breach their provisions. Therefore, no genuine issue of fact remains as to whether the defendants breached *written* contracts. The Manual and Ytterberg memorandum may give rise to *implied* contractual obligations, but their status as written documents does not make them written contracts. Accordingly, summary judgment is appropriate as to the claim that the defendants breached one or more written contracts.

## V. BREACH OF IMPLIED CONTRACT

The defendants dispute that certain representations made by Dresser could have given rise to implied contractual duties binding Dresser. The defendants isolate three sources of implied contractual duties: first, oral representations by George Korb and Ralph Ytterberg that Hawley's salary and fringe-benefits would continue unaltered; second, the Dresser Industrial Relations Manual and Ytterberg memorandum which provided for certain procedures to be followed prior to termination; and third, Dresser's compensation of two other discharged executives consisting of full salary payments which Dresser made until the executives reached the age 65. The Court will address each of these sources of implied duties in turn.

### A. *Oral Representations of George Korb and Ralph Ytterberg*

The defendants contend that the Korb and Ytterberg representations regarding Hawley's compensation and perquisites may have generated an "assumption" in Hawley that such benefits would remain the same after the demotion. Yet such

statements, according to the defendants, are promises made for the purpose of motivating Hawley and do not show a clear intent to bind both parties. Moreover, the plaintiff's subjective expectations do not create contractual rights. Finally, the defendants present a segment of Hawley's deposition in which he clearly states that the Korb and Ytterberg representations did not include a promise of employment for a specific time, until retirement, or even for Hawley's lifetime; they also did not include a promise that Dresser would never fire Hawley. 2 Hawley Dep. at 114, 117.

The plaintiff, by contrast, argues that Korb and Ytterberg not only made representations that Hawley would have continued salary and perquisites after the demotion, he also promised Hawley "job security." Thus, Hawley not only assumed that Dresser would not fire him, such a belief had support in an actual representation of job security. *See* 1 Hawley Dep. at 121. Moreover, Korb admitted that Hilton needed Hawley to help him run CEG. As a result of these representations, Hawley believes that Dresser in effect promised to retain him until he retired.

Dresser rebuts by noting that even if Dresser promised Hawley "job security" until retirement, such representations would not alter Hawley's at-will status. A contract to employ a person until retirement, according to Dresser and Korb, is an indefinite hiring, subject to termination at will under Ohio law.

■ The Court agrees with the defendants. Even assuming that Korb and Ytterberg represented to Hawley that his salary and perquisites would continue at then-current levels, such representations would not amount to a promise that Hawley would never be terminated. At most they are promises that Dresser would not cut Hawley's remuneration, *as long as he remains an employee.* If Dresser terminated Hawley, such promises would not apply.

■ The remaining representation is Ytterberg's alleged promise of "job security." Such a vague statement cannot give rise to a promise of employment for a specific term. Indeed, Hawley admits that

Dresser did not promise him a specific term of employment, lifetime employment, or employment until retirement. 2 Hawley Dep. at 114, 117. At most, a promise of job security would be the equivalent of a promise of employment until retirement or lifetime employment. Such a promise would not alter Hawley's at-will status. *See, e.g., Fallis v. Pendleton Woolen Mills, Inc.,* 866 F.2d 209, 213 (6th Cir.1989). In view of the strong presumption of employment at-will unless the parties' contract clearly manifests an intent otherwise, the Court does not construe the alleged promise of job security to change Hawley's status as an at-will employee. *See Henkel v. Educational Research Council of Am.,* 45 Ohio St.2d 249, 255, 344 N.E.2d 118, 122 (1976).

In sum, none of the statements made by Korb and Ytterberg constitute representations which could alter the at-will status of Hawley's employment. The representations of continued steady salary and perquisite benefits do not preclude termination. And the promise of "job security" is too indefinite to give rise to a specific term of employment and would at most be a promise of employment until retirement or the like which would not change Hawley's at-will status. Therefore, such statements cannot form the basis for an implied contract action and the Court will turn to other possible bases for the implied contract claim.

B. *Industrial Relations Manual and Ytterberg Memorandum*

The second source of implied contractual duties is the listing of layoff procedures in the Dresser Industrial Relations Manual and the Ytterberg memorandum. The defendants raise the same arguments against the Manual that they did when they contended that Dresser did not breach any written contracts. First, the Manual and Ytterberg memorandum did not give rise to contractual obligations; they were instructional as opposed to promissory. Hawley may not have seen the Manual before his termination. Second, the defendants substantially complied with the Manual's lay-

off procedures. Although the procedures call for the circulation of employees' resumes, persons at the high level of management are so well-known, such circulation is unnecessary. Dresser asked a number of corporate officers whether an opening for Hawley existed prior to his termination. No positions were available for Hawley. This action constituted standard procedure for individuals in Hawley's leadership position and also was substantial performance of Dresser's alleged obligations under the Manual.

The plaintiff responds that Hawley did indeed see the Manual in his capacity as President of CEG and Vice President–Planning. The Manual and the Ytterberg memorandum contained mandatory, not instructional, provisions concerning layoff procedures. If the company is considering laying off a person, such provisions require distribution of the employee's resume and priority to senior employees when considering the layoff of two otherwise equal employees. Hawley contends that top management officials were not familiar with his qualifications. Therefore, disregarding the obligation to circulate Hawley's resume was unjustified; Dresser should have followed the procedures in the Manual and the Ytterberg memorandum.

The defendants rebut by stressing the lack of contractual intent with the Manual and Dresser's substantial compliance with its terms. Also, the defendants read the Ytterberg memorandum to state merely that reductions in work force should be made only for financial reasons and not to remedy employees' performance problems and that due consideration would be made for seniority and needs of the company. According to the defendants, the undisputable facts show that the plaintiff's termination was made for economic and reorganizational reasons; further, Dresser considered Hawley's seniority and the needs of the company before terminating him, and discharged him only as a result of Dresser's decision, in the exercise of its business judgment, that Hawley's position should be eliminated.

The Court has already held that genuine issues of fact remain as to whether the parties intended for the Manual and the Ytterberg memorandum to be binding. Assuming they are binding, the next question is whether they contain provisions which the defendants may have breached. The Court noted earlier that the Manual and Ytterberg memorandum set forth certain procedures to be followed during a reduction in work force before termination is justified, and even then termination is authorized only under certain conditions. These provisions constitute terms of Hawley's employment which the defendants may have breached.

The final inquiry concerns Dresser's compliance with the procedural obligations in the Manual and Ytterberg memorandum. The Court finds that genuine issues remain as to whether the defendants substantially complied with the procedures set forth in these two documents. Specifically, it is undisputed that Dresser did not circulate Hawley's resume to other Divisions, did not prepare a written recommendation, and did not evaluate his work performance. As the Court already stated, these three facts, which the defendants do not challenge here, could lead a reasonable jury to believe that Dresser did not abide by its alleged obligations under the Manual and the Ytterberg memorandum.

Although the defendants need only substantially perform, reasonable jurors might find that the defendants did not take enough steps to find Hawley another position before terminating him. Evidence suggests that Korb was not fully familiar with Hawley's qualifications. Further, a reasonable jury could conclude that the defendants' alleged informal measures of finding a job for Hawley did not amount to substantial performance. Thus, even if the defendants can prove that Dresser eliminated Hawley's job in a legitimate reduction in work force, the plaintiff may still be able to prove breaches of Dresser's procedural duties.

In sum, a genuine issue of fact remains as to whether the Manual and the Ytterberg memorandum were binding upon

Dresser. Moreover, genuine issues of fact remain as to whether the defendants' performance substantially complied with the arguably relevant provisions in these documents. To the extent of possible implied duties stemming from these documents, then, summary judgment is inappropriate as to the plaintiff's implied contract theory.

## C. *Dresser's Treatment of Frank Durzo and George Howser*

■ The final source of implied duties which Hawley alleges is Dresser's handling of two other executives which may be evidence of a Dresser "policy" regarding older employees. Hawley contends that Dresser demoted two executives named Frank Durzo and George Howser and after their demotion, the company paid these men a salary and benefits until they retired. Apparently, the plaintiff is arguing that these events are evidence of a Dresser company policy to pay some or all aging executives with salaries until age 65, a policy which altered the plaintiff's at-will status and should have prompted Dresser to retain Hawley until retirement.

The defendants deny the existence of a policy other than at-will employment which would apply to the plaintiff. They state that the arrangements with Durzo and Howser were unique and not the result of an implied, biding contractual obligation. Durzo, the former President of Jeffrey Galion, signed a new five-year employment agreement with Dresser after it acquired Jeffrey Galion. Leeson Aff. ¶ 8; *id.* app. 2. The defendants allege that Howser was terminated under circumstances different from Hawley's. Finally, the defendants note Hawley admitted that he knew of other executives terminated before age 65 whom Dresser did not compensate until age 65. 2 Hawley Dep. at 123. Dresser's policy is to hire persons as at-will employees, Leeson Aff. ¶ 7, and therefore the company had no policy which could generate an obligation to retain Hawley until age 65.

In considering these arguments, the Court concludes that the defendants have met their initial burden of establishing the absence of a genuine issue of fact regarding these policies. The affidavit and deposition evidence which they cite tend to show that Dresser had no company policy other than at-will employment and that Dresser's dealing with Durzo was unique. The defendants also point out the lack of evidence that Howser was similarly situated to Hawley.

The plaintiff, then, has the duty of going beyond the pleadings by introducing evidence setting forth specific facts demonstrating the existence of a genuine issue for trial on this claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The plaintiff has not met this burden. His allegation regarding the treatment of Durzo and Howser is supported by nothing other than an allegation, in one of the plaintiff's memoranda on this motion, that Dresser demoted Durzo and Howser but paid them until retirement. He points to no deposition testimony or affidavits to support the allegation concerning their demotion and continued pay. Also, the allegations stands in contradiction with Hawley's pleadings, in which he states that Durzo and Howser were "discharged executives." Second Amended Complaint at 5. Hawley's allegation is therefore insufficient to withstand summary judgment. Accordingly, summary judgment is appropriate for the claim concerning the treatment afforded to Durzo and Howser; it cannot serve as a basis of implied contractual duties.

## D. *Conclusion as to Implied Contractual Duties*

The plaintiff proffered three sources which allegedly give rise to implied contractual duties: first, oral representations by George Korb and Ralph Ytterberg that Hawley's salary and fringe-benefits would continue unaltered; second, the Dresser Industrial Relations Manual and Ytterberg memorandum which require Dresser to prepare a performance evaluation and distribute officers' resumes to other Dresser officers prior to termination; and third, Dresser's compensation of two other allegedly demoted executives consisting of full sala-

ry payments made until the executives reached age 65.

The oral representations by Korb and Ytterberg cannot be the source of implied duties because they do not amount to promises of a specific term of employment and therefore do not alter Hawley's status as an at-will employee. The plaintiff's allegations concerning Dresser's treatment of Frank Durzo and George Howser are not enough to raise a genuine issue of material fact as to implied obligations. Thus, summary judgment is warranted on the implied contract claim insofar as it relates to Dresser's oral representations and its treatment of Durzo and Howser. Yet the Court concludes that the Dresser Industrial Relations Manual and the memorandum from Ralph Ytterberg may give rise to implied obligations. Therefore, summary judgment is inappropriate as to the implied contract claim inasmuch as Hawley relies on the Manual and Ytterberg memorandum as sources of implied duties.

## VI. PROMISSORY ESTOPPEL

The defendants' sixth argument for summary judgment addresses the promissory estoppel claim. The defendants argue that Hawley cannot maintain this claim because they made no promises altering Hawley's at-will status and because the plaintiff did not rely to his detriment on any such promise. Specifically, the defendants made no promise to Hawley that Dresser would employ Hawley for a specific period of time. They contend that their comments were motivational and similar to a pep talk. At most, Dresser promised that it would not lower Hawley's salary and benefits, but never stated that it would not fire or lay Hawley off. Furthermore, even if such promises altered Hawley's at-will status, the defendants argue that Hawley did not rely on such promises. He did not look for another job and did not forego any job offers between his 1981 demotion and 1983 termination.

Hawley replies by arguing that Dresser not only offered continued, unabated salary and perquisite benefits, but the defendants also promised Hawley "job security."

Dresser should have expected that Hawley would believe these promises altered his at-will status. Moreover, Hawley reasonably relied to his detriment on these promises when he not only decided to forego a search for new employment, he continued to provide services to Dresser prior to his termination. Hawley lost benefits which he could have received if he had found a job immediately after the demotion; and it would have been easier for Hawley to search for a new job in 1981 than it was in 1983.

■ In order to avoid summary judgment on his promissory estoppel claim, Hawley must demonstrate that at least genuine issues exist as to whether "(1) a promise was made by the defendant; (2) which the promisor should reasonably expect to induce action or forbearance (3) and which did induce such action or forbearance; and (4) enforcement of the promise is the only way to avoid injustice." *Bowman v. Firestone Tire & Rubber Co.*, 724 F.Supp. 493, 504 (N.D.Ohio 1989) (citing *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 104, 483 N.E.2d 150, 154 (1985)). For these requirements, *Mers* relied on *Talley v. Teamsters, Local No. 377*, 48 Ohio St.2d 142, 146, 357 N.E.2d 44, 47 (1976) (per curiam), which quoted section 90 of the Restatement of Contracts, Restatement (Second) of Contracts § 90 (1981). Accordingly, the Court infers that the Ohio Supreme Court intended to adopt the text and analysis of section 90 of the Restatement as the appropriate description of promissory estoppel doctrine in Ohio.

■ In determining what the defendants' representations meant, the Court must ascertain what the " 'promisor should reasonably expect' the *employee* to believe the promise means." *Mers*, 19 Ohio St.3d at 105, 483 N.E.2d at 154. In other words, the meaning of the promise depends upon the employer's expectations of the employee's subjective interpretation; and the trier of fact must judge the employer's expectations by an objective standard: it must decide whether the employer's expectations were reasonable.

**464**

In elaborating the meaning of the fourth requirement of promissory estoppel, that enforcement of the promise is the only way to avoid injustice, the American Law Institute noted that avoiding injustice "may depend on the reasonableness of the promisee's reliance." Restatement (Second) of Contracts § 90 comment b (1981). *Mers* incorporated this teaching by noting that a plaintiff asserting this theory must convince a jury that his acts flowing from the promise were reasonable. *Mers,* 19 Ohio St.3d at 104, 483 N.E.2d at 155. Case authority in general indicates a requirement that a plaintiff show his reliance was reasonable. *Kramer v. Medical Graphics Corp.,* 710 F.Supp. 1144, 1145 (N.D.Ohio 1989) ("whether Plaintiff reasonably relied upon such assurances is a question of fact"); *Crawford v. ITT Consumer Fin. Corp.,* 653 F.Supp. 1184, 1191 (S.D.Ohio 1986); *Kelly v. Georgia–Pac. Corp.,* 46 Ohio St.3d 134, 140, 545 N.E.2d 1244, 1250 (1989).

Normally, the reasonableness of a plaintiff's reliance is a question of fact, appropriate for adjudication by the jury and inappropriate for summary disposition, *Kramer,* 710 F.Supp. at 1145; *see Kelly,* 46 Ohio St.3d at 140, 545 N.E.2d at 1250; *Mers,* 19 Ohio St.3d at 105, 483 N.E.2d at 155. Nevertheless, the United States Court of Appeals for the Sixth Circuit has held that one type of reliance is unreasonable and does render a plaintiff's promissory estoppel claim vulnerable to summary judgment.

If an employer promises an employee "permanent" employment or employment "until retirement," any reliance on the promise would be unreasonable because "permanent" employment and employment "until retirement" constitute at-will employment. *Fallis v. Pendleton Woolen Mills, Inc.,* 866 F.2d 209, 213 (6th Cir.1989); *Meredith v. Rockwell Int'l Corp.,* 826 F.2d 463, 469 (6th Cir.1987) (quoting *Frankart v. Jeep Corp.,* No. L–85–062, 1985 WL 8222 (Ohio Ct.App. Nov. 8, 1985) (WESTLAW, OH–CS database)). Such reliance is therefore "insufficient to meet the requirements of a cause of action

in promissory estoppel." *Id.* (quoting *Frankart,* No. L–85–062, slip op. at 4).

In this case, Hawley contends that Dresser promised him permanent employment or employment until his retirement. Specifically, Korb and Ytterberg promised continued salary and perquisite benefits, as well as "job security." The Court finds it possible that Dresser should reasonably have expected that Hawley would believe that these statements meant Dresser promised permanent employment; and perhaps it would be unreasonable for Dresser to expect that Hawley would understand such a statement as nothing other than part of a pep talk. Accordingly, for purposes of this argument, the Court assumes that Dresser made a promise of permanent employment and Hawley therefore satisfies the first requisite element of avoiding summary judgment on the promissory estoppel claim, the existence of a promise.

Nonetheless, it does not follow that the plaintiff can avoid summary judgment on his promissory estoppel theory. Given Hawley's understanding of the defendants' promises, Dresser did in effect promise Hawley lifetime employment, but such a promise would not preclude termination. Hawley must show reasonable reliance in order to meet the fourth element of promissory estoppel, that injustice can be avoided only by enforcing the promise. Again, a plaintiff may not reasonably rely on promises of "permanent" employment or "employment until retirement." Since the representations here amounted to promises of permanent employment, Hawley cannot show reasonable reliance. Accordingly, he cannot meet the fourth element of promissory estoppel, avoidance of injustice.

In short, the plaintiff has shown significant probative evidence of a promise which Dresser made. Since the promise was at most one of permanent employment, however, any reliance on it would be unreasonable. The Court need not reach the issue of whether Hawley did actually rely on the promise, then, to conclude that the defendants must prevail as a matter of law for failure to meet an essential element of a

promissory estoppel claim, the requirement that enforcement of the promise be necessary to avoid injustice. No genuine issue remains in this inquiry; therefore, summary judgment is appropriate as to the plaintiff's promissory estoppel claim.

## VII. IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

The defendants' next argument is that Ohio law does not recognize the plaintiff's claim concerning a breach of an implied covenant of good faith and fair dealing. The law does not require an employer to act in good faith when terminating an at-will employee, according to the defendants.

The plaintiff agrees that there is no implied covenant of good faith and fair dealing in an at-will employment contract. Yet Hawley contends that this proposition of law is inapplicable. The employment relationship between Hawley and Dresser was not at-will. If the employment relationship were other than at-will, Hawley maintains, the parties are bound by an implied duty of good faith and fair dealing.

The parties are correct that Ohio law does not recognize an implied covenant of good faith and fair dealing in at-will employment contracts. *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 105, 483 N.E.2d 150, 155 (1985). If the trier of fact finds that Hawley is an at-will employee, then, the plaintiff would not dispute that he would have no cause of action upon an implied covenant of good faith and fair dealing.

Hawley may not be an at-will employee, though. The Court has already held that the Dresser Industrial Relations Manual and the memorandum from Ralph Ytterberg may govern the terms and conditions of Hawley's employment. If so, Dresser would have an obligation to follow certain procedures prior to any termination and discharge would be permissible only in certain circumstances. In that sense, Dresser cannot terminate Hawley at any time and

for any reason in all circumstances. Assuming that the Industrial Relations Manual and Ytterberg memorandum are binding, then, there would be at least one instance, a reduction in force situation, in which Dresser would have to meet certain conditions before it could fire employees like Hawley.

The Court assumes, of course, that Dresser could terminate Hawley at any time under any circumstances if it had just cause to do so. Thus, in a reduction in work force situation, Dresser could discharge the plaintiff even if it did not abide by the provisions of the Manual and Ytterberg memorandum, as long as it had just cause.[9] Thus, the Court cannot conclude that Dresser could not terminate Hawley at all during a reduction in work force. Rather, the best characterization of the plaintiff's employment is that Hawley could not be terminated summarily during a reduction in force without just cause; only the procedures and circumstances in the Manual and Ytterberg memorandum would justify termination absent some just cause. Given that a genuine issue exists as to whether the Manual and Ytterberg memorandum are binding, a genuine issue exists as to whether Dresser could fire Hawley at will and therefore whether Hawley was an at-will employee.

Since a genuine issue of fact remains as to whether Hawley was an at-will employee, summary judgment is not appropriate on account of the reason initially advanced by the defendants, namely that at-will employment relationships do not entail an implied covenant of good faith and fair dealing. Another reason, though, might justify summary judgment. The crucial issue, then, is whether non-at-will employment relationships entail an implied covenant of good faith and fair dealing.

The case law regarding the implied covenant issue in general contains two strains of reasoning. First, the courts emphasize that in employment at-will situations, an

9. By using the term "just cause" here, the Court does not mean that the reduction in force itself acts as possible just cause in this instance. Reductions in force are the subject of special limi-

tations in the Manual and memorandum, not applicable to other kinds of "just cause," such as malfeasance of duty.

employer may discharge an employee for any reason, even if termination would be in gross or reckless disregard of an employee's rights. This powerful right on the part of employers is inconsistent with a duty of fair dealing and good faith. For this reason, the courts decline to hold that at-will employment contracts contain such a duty by way of an implied covenant. *See, e.g., Pyle v. Ledex, Inc.,* 49 Ohio App.3d 139, 146, 551 N.E.2d 205, 212 (1988), *motion to certify overruled,* 38 Ohio St.3d 717, 533 N.E.2d 787 (1988).

Second, some courts acknowledge that parties to any contract are bound to one another by standards of good faith and fair dealing. *Ebie v. Teledyne Indus., Inc.,* No. 87–3852 (6th Cir. Sept. 21, 1988) 859 F.2d 152 (table) full text available on WESTLAW 1988 WL 98366 (LEXIS, Genfed library, Ctapp File); *Bolling v. Clevepak Corp.,* 20 Ohio App.3d 113, 121, 484 N.E.2d 1367, 1376 (1984). Yet such a duty "means only that, when a contract is susceptible to a fraudulent interpretation as well as an honest one, the latter should be presumed." *Ebie,* No. 87–3852, slip op. at 10 [859 F.2d 152 (table) ] (WESTLAW and LEXIS pagination). Thus, such a duty is not one which would give rise to an implied covenant of good faith and fair dealing in every employment contract, the breach of which would be actionable under a contract theory. *Id.* (citing *Bolling,* 20 Ohio App.3d at 121–22, 484 N.E.2d at 1376).

▮ Both of these strains of reasoning are applicable to the at-will employment context. Many courts have used the first to reject at-will employees' actions on an implied covenant of good faith and fair dealing. *Ebie* used the second in deciding that an at-will employee could not maintain an action on such an implied covenant. The reasoning in *Ebie,* however, is not limited to at-will employment cases. Although the first strain of reasoning concerning an implied covenant clearly applies only to at-will employment, the holding in *Ebie* does not. The Court now follows *Ebie* and holds, therefore, that non-at-will employment contracts do not have an implied covenant of good faith and fair dealing which is actionable under a contract theory. Sum-

mary judgment is appropriate, then, on Hawley's claim under an implied covenant of good faith and fair dealing.

## VIII. REDUCTION IN WORK FORCE

The defendants' eighth argument supporting their motion for partial summary judgment is their contention that if they were under a contractual duty to refrain from terminating Hawley except for just cause, they discharged it. Termination because of an economic need to reduce the work force constitutes just cause and this justification was applicable to Hawley's employment. The plaintiff, by contrast, suggests that Dresser's motivation was not to reduce the work force and that he has raised a genuine issue of fact regarding the true reason for the termination.

Although this Opinion and Order dismisses the claims of breach of written contract, and breach of implied contract based on oral promises and conduct towards Durzo and Howser, the issue is nonetheless crucial. The defendants may be able to prevail on all contract claims even if Hawley can show that Dresser and Korb made written, oral, or implied promises that Dresser would not terminate Hawley, unless it had just cause to do so. Hawley alleges that the Industrial Relations Manual and Ytterberg memorandum were binding and these documents provided that Dresser could not discharge Hawley at will. Just cause, however, would justify termination. Thus, if the defendants could show just cause for the discharge, then they could prevail on all contract claims even if the Manual and Ytterberg memorandum were binding.

The plaintiff does not dispute that a reduction in work force would constitute "just cause" in the context of a breach of employment contract claim. *See, e.g., Boynton v. TRW, Inc.,* 858 F.2d 1178, 1184 (6th Cir.1988). Accordingly, the main issue is whether Dresser's actions had an economic motivation, reducing the work force, or whether they had a discriminatory motivation.

Hawley states that this Court has already determined that a genuine issue of

fact exists as to what motivated the discharge; it held that Hawley presented sufficient evidence to raise a genuine issue as to whether Dresser's reason for terminating Hawley was a pretext. Although the Court decided this issue in the course of determining whether Hawley had avoided summary judgment on his discriminatory demotion claim under ADEA, the decision is applicable here. In other words, a factual issue remains as to why Dresser terminated Hawley, an issue which has implications for both ADEA and the contract claims.

The defendants respond by contending that the Court's earlier ruling is inapplicable here. ADEA and the contract claims are different and have distinct requisite elements. In order to prevail on the contract claims, Hawley must show the existence of a contract barring termination without just cause, which he cannot do according to Korb and Dresser. The Court assumes that the defendants are arguing that the Court need not reach the issue of the ADEA holding's effect on the just cause question because Hawley failed to show the existence of a contract precluding termination without just cause.

The Court finds the defendants' argument to be unpersuasive. First, the only kind of "just cause" which the defendants assert, a reduction in force, apparently cannot justify *summary* discharge in this case. Reductions in force are the subject of the Manual and Ytterberg memorandum. These documents, if binding, require Dresser to follow certain procedures prior to discharging an employee. Although a "just cause" such as malfeasance of duty could justify termination even if Dresser failed to follow proper procedures during a reduction in force, the reduction itself cannot serve as "just cause" for summary dismissal in view of the discharge procedures. Accordingly, since the "just cause" rationale on which the defendants rely falls under special limitations in this case, a simple showing of a legitimate reduction in force is not enough to demonstrate that the defendants complied with all contractual duties. The plaintiff could assert a breach of the defendants' procedural duties, even

granting that the reduction in force was legitimate.

Second, even assuming that a reduction in force could be "just cause" for Hawley's allegedly summary dismissal, the reduction in force may not have been the real reason for the discharge. The Court reaches the issue of whether the ADEA holding provides guidance on this issue because the plaintiff has shown a genuine issue of the existence of an implied contract barring termination in certain circumstances except for just cause. Thus, the Court must decide if the reduction in force was the real reason for the discharge; the Court must determine if the reduction was the "just cause" under the implied contract for terminating Hawley just as it must decide if it was the legitimate nondiscriminatory reason under ADEA to discharge the plaintiff. The two inquiries are related because both require the trier of fact to ascertain the real reason for the discharge.

The Court's ADEA holding is bottomed on the determination that a genuine issue of fact exists as to why Dresser discharged Hawley. The Court's earlier holding applies to the contract claims as well as the ADEA allegation. Subsequent proceedings do not justify a change in this holding. Accordingly, a genuine issue of fact exists as to whether Dresser discharged Hawley for just cause. Therefore, this argument cannot justify dismissal of all contract claims.

## IX. WAGE DISCRIMINATION

The defendants' ninth argument in support of their motion for summary judgment is that the plaintiff's state law wage discrimination allegation is untimely and has no support in the record. Hawley received compensation through December 31, 1983 and received six months' salary as severance pay. According to the defendants, Hawley asserted the wage discrimination claim for the first time in an amended complaint in March 1987.

The defendants argue that Hawley's wage discrimination claim is untimely because plaintiffs must assert wage discrimi-

nation claims within one year of the date of the violation. *See* Ohio Rev.Code Ann. § 4111.17(E) (Anderson 1980). Here, the plaintiff asserted his wage discrimination claim more than three years after the last date of alleged wage discrimination by way of the amended complaint. Thus, the plaintiff exceeded the one-year limit. The defendants also contend that no evidence supports Hawley's wage discrimination claim. They cite a passage of Hawley's deposition and claim that Hawley admitted that age was not a factor in setting the level of his compensation. 2 Hawley Dep. at 133, 135–36.

The plaintiff, by contrast, posits that his wage discrimination claim was not untimely and is supported by the evidence. The crux of the plaintiff's claim is that Dresser paid Hawley less than it did others as a result of the termination. That is, Dresser paid him nothing after the discharge when it should have paid him a salary commensurate with the one he earned as President of CEG. The difference between his old salary and the $0 he received after termination, according to Hawley, is the amount of the discrimination. The facts surrounding the termination constitute the evidence supporting the wage discrimination claim.

Hawley also contends that his wage discrimination claim is not untimely because he alleged all of the relevant facts concerning his termination in the original complaint. He argues further that the new theory of wage discrimination presented in a subsequent amended complaint relates back to the facts in the original complaint, and given that the original complaint was timely, his wage discrimination claim was timely as well.

The defendants contend on rebuttal that the plaintiff's theory concerning wage discrimination is not viable. The statute applies only when the company pays an employee less because of age than others who are similarly situated. It does not apply to terminated individuals because in such a situation the employer is not discriminating in the "payment" of "wages" to two individuals and the employer is not discriminating against one "employee" in favor of "another." The employer does not pay wages to the discharged employee at all and discharged persons cannot constitute "another employee" within the meaning of the statute.

The Court need not reach the defendants' argument that the wage discrimination claim is untimely because the Court finds persuasive the defendants' argument on rebuttal. The relevant statute provides:

> No employer ... shall discriminate in the payment of wages on the basis of ... age ... by paying wages to any employees at a rate less than the rate at which he pays wages to another employee for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar conditions.

Ohio Rev.Code Ann. § 4111.17(A) (Anderson 1980).

The Court agrees with the defendants that section 4111.17 applies when the defendant is paying one current employee less than another current employee because of age. The statute does not apply when the defendant has terminated the plaintiff. In such a case, the employer would not be favoring one current "employee" over "another," which is what wage discrimination involves, according to the statute. Hawley, as a discharged officer, was not "another employee" at the time of the alleged wage discrimination.

Furthermore, the statute states that discrimination involves the "payment" of some employees higher "wages" than the "wages" it pays to others. Since Dresser was not "paying" Hawley "wages" after the discharge which could have been lower than what it "pays" others, Hawley does not fall within the scope of the statute. Thus, Dresser did not discriminate against Hawley under section 4111.17 by terminating him.

In sum, the Court finds that even if Dresser terminated Hawley because of age, the discharge would not be actionable under the wage discrimination statute. Moreover, Hawley does not claim that he was paid less, while employed, because of his age. 2 Hawley Dep. at 133, 135–36.

Accordingly, summary judgment is appropriate on the plaintiff's wage discrimination claim.

## X. INFLICTION OF EMOTIONAL DISTRESS

The tenth argument propounded by the defendants in favor of their motion for partial summary judgment is their argument that the Court should dismiss the plaintiff's intentional infliction of emotional distress claim. Although the defendants challenge each element of such a cause of action, the defendants specifically refer to the "extreme and outrageous conduct" requirement. They contend that the termination of Hawley did not so exceed the bounds of decency in a way which could constitute outrageous and extreme conduct. Dresser officials conducted the termination meeting in a professional and humane fashion.

Hawley, though, argues that his emotional distress claim is based on negligent as well as intentional infliction of emotional distress. Given the defendants' failure to address negligent infliction of emotional distress, Hawley concludes he can proceed on such a claim. Hawley also maintains that evidence does support his action for intentional infliction of emotional distress. The plaintiff, apparently agreeing that his emotional distress stemmed only from his termination, argues that the termination was in callous disregard of his rights and past services on behalf of the company. Such disregard constitutes outrageous and extreme conduct even if the Dresser officials were cool and calm at the termination meeting.

The defendants rebut by stating that Hawley's assertion of the negligent infliction of emotional distress theory is untimely. He did not assert it in the original or amended complaints. Moreover, the defendants argue that Ohio law does not recognize negligent infliction of emotional distress in employment cases. Finally, they insist that the termination of the plaintiff does not constitute extreme and outrageous behavior for purposes of intentional infliction of emotional distress.

The plaintiff rejoins by stating that notice pleading is all that is required to support a claim. Hawley notes that the Second Amended Complaint alleges that he suffered emotional distress. Such an allegation is enough to place the defendants on notice of a claim of negligent *or* intentional infliction of emotional distress. Moreover, the Ohio courts contemplate liability for negligent infliction of emotional distress in the termination context, even if the usual case involves spectators to automobile accidents.

In a supplemental memorandum, the defendants attack the seriousness of the emotional distress Hawley suffered as a result of the alleged negligent infliction of emotional distress. They argue that Hawley's distress was not sufficiently serious to support an action under this theory.

 Turning to the intentional infliction of emotional distress claim, the Court holds that Hawley's termination did not rise to the level of extreme and outrageous conduct. The plaintiff seems impressed by the injustice of his termination and does not challenge the manner in which Dresser terminated him. The plaintiff contends that the termination was unjustified in view of Hawley's long and successful service to the company and its predecessor. Nevertheless, the mere unjustifiable nature of a termination does not make it extreme and outrageous. It certainly is not so extreme in character and degree to make it beyond all possible bounds of decency. *See Yeager v. Local Union 20,* 6 Ohio St.3d 369, 375, 453 N.E.2d 666, 671 (1983) (quoting Restatement (Second) of Torts § 46 comment d (1965)). Accordingly, summary judgment on the plaintiff's intentional infliction of emotional distress claim is warranted.

The analysis regarding the negligent infliction of emotional distress is different, though. The Ohio Supreme Court recognized such a cause of action in *Schultz v. Barberton Glass Co.,* 4 Ohio St.3d 131, 447 N.E.2d 109 (1983); *see also Paugh v. Hanks,* 6 Ohio St.3d 72, 451 N.E.2d 759 (1983). The parties do not dispute that bystanders to accidents may be able to recover under this theory for severe emo-

tional distress. Nevertheless, the courts have not yet recognized an application of the theory to cases involving the termination of employment.

Indeed, this Court has stated that there is "no cause of action for negligent infliction of emotional distress in any employment context." *Penn v. Rockwell Int'l Corp.,* 48 Fair Empl.Prac.Cas. (BNA) 624, 631, 1988 WL 149613 (S.D. Ohio 1988); *Stradford v. Rockwell Int'l Corp.,* 48 Fair Empl.Prac.Cas. (BNA) 697, 703, 1988 WL 159939 (S.D. Ohio 1988). The rationale for this rule is that a victim may sue under the negligent infliction of emotional distress theory *"only* when the victim, or someone closely related to the victim, faced actual physical peril." *Penn,* 48 Fair Empl.Prac. Cas. (BNA) at 631; *Stradford,* 48 Fair Empl.Prac.Cas. (BNA) at 703; *see Oldfather v. Ohio Dep't of Transp.,* 653 F.Supp. 1167, 1181 (S.D. Ohio 1986), *appeal dismissed,* 816 F.2d 681 (6th Cir.1987);[10] *Criswell v. Brentwood Hosp.,* 49 Ohio App.3d 163, 165, 551 N.E.2d 1315, 1318 (1989) ("no physical peril"); *Presti v. Ahrens,* No. 54620, slip op. at 14–15, 1988 WL 122934 (Ohio Ct.App. Nov. 17, 1988) (WESTLAW, OH–CS database) (WEST-LAW pagination); *Tohline v. Central Trust Co.,* 48 Ohio App.3d 280, 284, 549 N.E.2d 1223, 1228 (1988) (discharge "was not a physical accident"), *appeal dismissed,* 41 Ohio St.3d 703, 534 N.E.2d 1202 (1989).[11]

The plaintiff alleges no physical peril here and relies solely on wrongful termination as the basis for his negligent infliction of emotional distress claim.

Thus, the plaintiff's negligent infliction of emotional distress allegation fails to state a claim upon which relief can be granted. Given this conclusion, the Court need not reach the issues of whether Hawley's assertion of this theory was timely and whether Hawley sustained sufficiently serious injury to recover under it.

The cases cited by the plaintiff are not contrary to the Court's holding. The plaintiff notes one decision in which the court considered whether injury suffered by the plaintiffs was severe enough to support either intentional or negligent infliction of emotional distress. *Shinholster v. Akron Automobile Ass'n,* 711 F.Supp. 357 (N.D. Ohio 1989). In its reasoning, the court mentioned in passing the standard which a plaintiff must meet in proving severe emotional distress. *Id.* at 365–66. This mention of the standard to be met, however, does not constitute the court's recognition of the applicability of the negligent infliction of emotional distress theory to employment cases. In fact, the court declined to extend the theory to the facts of the case, a wrongful discharge, but instead limited its applicability to tort situations by requiring a showing of a breach of tort duty which the court did not find. *Id.* at 366. Thus, *Shinholster* supports the defendants' position.

Similarly, *Helmick v. Cincinnati Word Processing, Inc.,* 45 Ohio St.3d 131, 543 N.E.2d 1212 (1989), does not support the plaintiff's position. Hawley maintains that *Helmick* implicitly recognized the applicability of the negligent infliction of emotion-

**10.** Hawley argues that *Oldfather* did not hold that a discharged employee could not maintain an action for negligent infliction of emotional distress. According to Hawley, the court merely stated that cases contemplating recovery under this theory "usually" involved bystanders to accidents, but the courts do not limit recovery to such cases. This assertion distorts the holding in *Oldfather.*

The court in *Oldfather* noted that Ohio cases have involved bystanders to accidents, without qualifying this observation with a word like "usually." *Id.* The court held that *Oldfather* was not such a case. *Id.* For that reason, the court ordered judgment against the plaintiff on the negligent infliction of emotional distress

claim. *Id.* at 1183. The clear implication of the court's statements and its order dismissing the claim is that negligent infliction of emotional distress does not apply to claims other than those asserted in a situation involving physical peril from, for instance, an accident.

**11.** A plaintiff alleging negligent infliction of emotional distress must show "location of the emotionally injured party near the scene of an accident or injury; a contemporaneous observance of the accident or injury by the emotionally injured party; and a close relationship between the victim of the accident or injury and the emotionally injured party." *Presti,* No. 54620, slip op. at 14–15 (WESTLAW pagination).

al distress theory to the employment context because the court mentioned that Helmick asserted the theory and the court later remanded the case upon holding that chapter 4112 [12] did not abolish the tort claims which Helmick had raised. This mention in passing of the theory, however, is not the same as a square holding that the theory is viable in the employment context. The issue was not before the court.

Also, in *Edwards v. Mt. Washington Baptist Day Care Center*, 44 Ohio App.3d 96, 541 N.E.2d 465 (1988), the court did not reach the issue of whether Ohio law recognizes the tort of negligent infliction of emotional distress for wrongful discharge situations. Contrary to what Hawley claims, the court did not imply that a negligent infliction of emotional distress action provides a remedy for *any* foreseeable emotional injury.

*Edwards* simply held that injury was not foreseeable where the plaintiffs were not near the scene of a physical danger to their child. The plaintiffs had discovered, after the fact, that their child had wandered from the defendant's day care center. This holding is perfectly consistent with the proposition that recovery is possible only when the victim, or someone closely related to the victim, faced actual physical peril. The fact that the plaintiffs might have met the foreseeability requirement under different circumstances does not gainsay the existence of a physical danger requirement.

Another case cited by the plaintiff did not reach the legal question of the viability of a negligent infliction of emotional distress claim in this context, due to a threshold question of collateral estoppel. *Kerr v. Procter & Gamble Co.*, No. 88AP–629, 1989 WL 11961 (Ohio Ct.App. Feb. 14, 1989) (WESTLAW, OH–CS database). *Kerr* held that when the parties have not yet litigated the question of whether the plaintiff's injury took place in the course of employment, collateral estoppel did not preclude an argument about the situs of the injury. *Id.* at 6. *Kerr* did not thereby endorse the viability of a negligent infliction of emotional distress action asserted

by an employee in a wrongful termination situation.

The plaintiff cites another Ohio court of appeals case which is somewhat more troubling. *Oehrtman v. Third Nat'l Bank & Trust Co.*, No. 2–87–4, 1988 WL 138021 (Ohio Ct.App. Dec. 12, 1988) (WESTLAW, OH–CS database). *Oehrtman* held that the factual issue of whether the plaintiff suffered severe emotional distress does not depend on whether the injury stemmed from a contractual breach or a tort. Therefore, the court allowed the issue of damages to go to the jury; the court could not foreclose proof on this point as a matter of law simply because of the nature of the action as a contract case.

The plaintiff made the argument that *Oehrtman* permits plaintiffs to proceed on a negligent infliction of emotional distress in this, an employment contract case. Although this is a colorable reading of *Oehrtman*, the Court disagrees with it. Instead, the Court interprets *Oehrtman* to mean only what it says: the *factual* issue of whether the plaintiff suffered distress does not depend on the nature of the action. The trier of fact can decide whether or not the plaintiff has suffered distress regardless of what caused the distress. Yet the *legal* issue of which kinds of injuries may give rise to a negligent infliction of emotional distress action does depend on the nature of the action. Therefore, *Oehrtman* does not address the legal question at issue here.

In sum, the plaintiff does not allege suffering emotional distress as a result of some negligence which placed him in physical peril. Thus, the Court holds that Hawley failed to state a claim for negligent infliction of emotional distress upon which relief can be granted. Accordingly, summary judgment as to this claim is appropriate.

## XI. PUNITIVE AND COMPENSATORY DAMAGES

█ The defendants' final argument is that the plaintiff cannot maintain a demand

---

**12.** Ohio Rev.Code Ann. §§ 4112.01–4112.99

(Anderson & Supp.1989).

for punitive damages. They argue that punitive damages are unavailable under ADEA, Ohio Rev.Code Ann. 4101.17 (Anderson 1980), and contract law. The only theory asserted by Hawley which could support a demand for punitive damages would be the intentional infliction of emotional distress claim, according to the defendants. If the Court were to dismiss the intentional infliction of emotional distress claim, they contend, the Court must strike the demand for punitive damages.

Moreover, the defendants assert that pain and suffering would be unrecoverable if the Court were to dismiss the infliction of emotional distress claim. The Court assumes that the defendants are referring to the claims of both negligent and intentional infliction of emotional distress here. The defendants contend that Hawley may recover only his lost wages and fringe benefits in such circumstances. The Court should, they maintain, dismiss all other demands for compensatory damages.

The plaintiffs only opposition to this argument is that punitive damages are indeed available under section 4101.17 where defendants have acted in reckless disregard of the plaintiff's rights. Hawley states that enough evidence exists to raise a genuine issue of material fact as to whether the defendants did act in reckless disregard of the plaintiff's rights. Thus, Hawley argues that the Court should not dismiss the demand for punitive damages.

The Court has dismissed the demotion claim under section 4101.17 and also has stated that section 4101.17 does not permit the recovery of compensatory and punitive damages. *See supra* note 6 (citing *Hoops v. United Tel. Co.*, 50 Ohio St.3d 97, 101, 553 N.E.2d 252 (1990); *South v. Toledo Edison Co.*, 32 Ohio App.3d 24, 24, 26–27, 513 N.E.2d 800, 801, 803–04 (1986) (paragraph two of the syllabus)). The Court now accepts as a holding what it noted earlier in dicta. Thus, the Court concludes that the plaintiff cannot recover compensatory and punitive damages under section 4101.17.

In sum, the Court holds that Hawley cannot maintain a demand for any damages except for lost wages and benefits, liquidated damages under ADEA, and other damages stemming from the breach of implied contract. The plaintiff can demand these damages for his ADEA discharge claim, his discharge claim under section 4101.17, and his implied contract claim. Hawley cannot recover any other damages.

WHEREUPON, upon consideration and being duly advised, the Court finds the defendants' motion for partial summary judgment to be partially meritorious. To the extent that the defendants seek dismissal of (1) the ADEA demotion claim, (2) the state law demotion claim under Ohio Rev. Code Ann. § 4101.17 (Anderson 1980), (3) the breach of written contract claim, (4) the breach of implied contract claim, insofar as it is based on oral representations by Korb and Ytterberg as well as Dresser's treatment of Durzo and Howser, (5) the promissory estoppel claim, (6) the claim regarding the breach of an implied covenant of good faith and fair dealing, (7) the wage discrimination claim, (8) the intentional and negligent infliction of emotional distress claims, and (9) all demands for punitive damages and compensatory damages other than lost wages and benefits, liquidated damages under ADEA, and other contractual damages, the motion is meritorious and it is, therefore, GRANTED. Insofar as the defendants seek dismissal of the implied contract claim based on the Ytterberg memorandum and Industrial Relations Manual, the motion is meritless and it is, therefore, DENIED.

IT IS SO ORDERED.

## APPENDIX A

### Exhibit 1

LAW OFFICES

## LANE, ALTON & HORST

155 EAST BROAD STREET

COLUMBUS, OHIO 43215

May 8, 1984

Equal Employment Opportunity Commission

Washington, D.C. 20506

Re: Chester G. Hawley
2690 Edington Road
Columbus, Ohio 43221

This is notice on behalf of Mr. Chester G. Hawley pursuant to the requirements of the Age Discrimination in Employment Act 29 U.S.C.A. Sec. 621–634 of his intention to file civil action against Dresser Industries, Inc. with corporate offices at 1505 Elm Street, Dallas, Texas 75201 (mailing address P.O. Box 718, Dallas, Texas 75221).

It is Mr. Hawley's claim that he was unlawfully discharged from the employment of Dresser Industries, Inc. because of his age. At the time of discharge Mr. Hawley was Vice President—Planning and Consultant of the Construction Equipment Group of Dresser located at Columbus, Ohio. He was just days short of 62 years of age and had served Dresser or its divisions for almost 38 years. From 1977 to 1981 Mr. Hawley had served as President of Dresser's Construction Equipment Group. On July 6, 1981 he was advised that he was being replaced as President of that Group but that the corporation wanted him to remain in another capacity; that he was needed. There was no discussion in July of 1981 or at the time of his discharge in December 1983 of poor performance. He was simply informed that there was no place for him in the organization. Accordingly, it is Mr. Hawley's claim, and the facts appear convincingly to support such claim, that he was discharged because of age.

It is Mr. Hawley's intention to institute legal action in Federal District Court to recover damages from Dresser covering loss of salary, bonuses, pension, future compensation opportunities, and other damages for the period January 1, 1984 to normal retirement on January 31, 1987. It is also Mr. Hawley's intention to join Mr. George A. Korb, Vice President—Operations of Dresser in such action.

Sincerely,
LANE, ALTON & HORST
Jack R. Alton